Lowrence BERNAL, Appellant,

v.

STATE of Texas, Appellee.

No. 11–00–00361–CR.

Court of Appeals of Texas,
Eastland.

March 14, 2002.

Discretionary Review Refused
June 26, 2002.

Tim Copeland, Abilene, for appellant.

Britt Thurman, Dist. Atty., Anson, for appellee.

Panel consists of: ARNOT, C.J., and McCALL, J., and DICKENSON, S.J.*

Opinion

BOB DICKENSON, Senior Justice (Retired).

The jury did not convict Lowrence Bernal of capital murder; it did convict him of the first degree felony offense of murder.[1] The jury then assessed his punishment at confinement for 45 years. We affirm.

## Background Facts

The State indicted appellant, one other man, and one woman for the murder of Andrew Phillip Sorenson (the victim) on August 20, 1999. The woman negotiated a plea and testified for the State. Appellant claims in this appeal that the accomplice's testimony was not sufficiently corroborated under TEX. CODE CRIM. PRO. ANN. art. 38.14 (Vernon 1979). Appellant also argues that the trial court erred in allowing proof of extraneous offenses and in permitting improper jury arguments.

## Points of Error

Appellant presents eight points of error. First, he argues in Points of Error Nos. 1 and 2 that the trial court erred in allowing argument during the punishment phase of trial about how the parole laws would affect him. Then, he argues in Point of Error No. 3 that the "repetitive argument of the prosecution as to parole laws" was so egregious that it could not have been cured by an instruction and in Point of Error No. 4 that the trial court erred in allowing, over objection, the prosecution's

argument that "the jury would be responsible" if appellant got out of prison and killed again. Next, he argues in Points of Error Nos. 5 and 6 that the trial court erred in allowing evidence of extraneous offenses during the punishment phase of trial "because the prejudicial effect of the evidence outweighed its probative value" and because there was insufficient proof that appellant participated in those offenses. Finally, he argues in Points of Error Nos. 7 and 8 that the trial court erred in holding the evidence to be sufficient to sustain the conviction because "the accomplice testimony was not corroborated as required" by Article 38.14 and because "an accomplice witness was only corroborated by the testimony of other accomplice witnesses."

## The Accomplice's Testimony

Lisa Thomas Jernigan, the accomplice, testified in response to questions by the district attorney that she had agreed to plead guilty to the offense of "tampering with physical evidence" with the understanding that she would be sentenced to a term of 10 years, that she could seek probation, that she would testify for the State against the two men who had been indicted for the victim's murder, and that the murder indictment against her would be dismissed. Jernigan also agreed that: (1) if the evidence showed that she participated in the murder, the State could try her for murder; and (2) if she did not tell the truth when she testified, the State could prosecute her for perjury.

Jernigan testified that she was from Great Britain; that she came to the United

---

* Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

1. Count One of the indictment charged the capital offense of committing murder "in the

course" of robbery. The State did not seek the death penalty. Count Two of the indictment charged the first degree felony offense of murder.

States in 1996 while she was married; that she is now divorced; and that her former husband was stationed at Dyess Air Force Base, near Abilene, until he was sent to Korea in April of 1999.

Jernigan met the victim in April of 1999, and they started dating about one week later.[2] Their on-and-off relationship lasted from April of 1999 until August of 1999 when the victim was killed. Jernigan had a house at 734 Lexington Avenue in Abilene, and the victim moved into the house with her. They were sleeping together, and she was pregnant at the time of his death.[3] She testified that she was not using drugs before the victim moved into her house, that the victim stole from her to pay for methamphetamine which he injected with a needle, and that he got some of his drugs from David Allen Goyne.[4]

Jernigan testified that she had thrown the victim out of her house "a couple of times." On one occasion in July, after the victim was "supposed to have quit doing drugs," she caught him "doing them again" and threw him out. There was another occasion when they broke up; but "his clothes kind of stayed," and he kept coming back to visit. In late July, the victim voluntarily took drug treatments at the Serenity House in Abilene, but he did not complete the program. The victim was living with his mom at that time; but "most of his stuff" was still at Jernigan's house, and he would stay with her some nights. Jernigan said that the victim never hit her, but that he was "driving [her] crazy" and that she "wanted to get rid of him." At that time, the victim "was constantly using" drugs, was "constantly

high," and was "seeing things, hallucinating." Jernigan's testimony on direct examination by the district attorney reads in relevant part as shown:

Q: Okay. How many times did you talk to [appellant] about possibly him helping you do something with [the victim] because [the victim] was all over you, or [the victim] was doing drugs so much?

A: I never asked him to help me. I just said I wanted to get rid of [the victim], and that was a couple of times I said that.

Q: Did you ever talk to David Goyne about that?

A: Not that I'm aware of, unless he overheard—

\* \* \*

Q: Did you [go into the kitchen at appellant's house on the night of August 19, 1999, and tell appellant and Goyne] that you needed to get rid of [the victim] because he was bumping again?

A: Yes, sir.

Q: What do you mean by bumping?

A: Injecting methamphetamines.

Q: What did you mean by get rid of?

A: I mean I wanted him out of the house.

\* \* \*

Q: [After the four of them had gone from appellant's house in Abilene to Jones County] So y'all are walking towards the shed and then what happens?

A: [Appellant] grabs ahold of [the victim].

2. Jernigan testified that she had been working with the victim's mother at Montgomery Ward and that the victim's mother asked her to take him to the Cactus Moon to listen to music.

3. Jernigan also testified that she had a tattoo of the victim's name because she loved him and that he had a tattoo of her name.

4. Goyne was with appellant and Jernigan when the victim was killed.

Q: Do you remember where [appellant] was in relationship to which side of [Goyne] he was?

A: [Appellant] was on this side and [Goyne] was on this side.

Q: And so [appellant] grabs ahold of [the victim]. How did [appellant] grab ahold of [the victim]?

A: In a headlock.

\* \* \*

Q: [After the struggle between the victim, appellant and Goyne], what happened?

A: [The victim] was dead.

Jernigan described how appellant and Goyne took the shoes, pants, and watch from the body; used telephone cords to tie cinder blocks to the hands and feet; and dropped the body into the well. Jernigan admitted that she had "gone to bed" with appellant once before he killed the victim and three or four times after the victim was killed.

During her cross-examination by appellant's trial counsel, Jernigan testified that she did not mean for the two men to kill the victim; that she just meant for them to help her throw the victim out of her house; that she did not want to go to prison; that she was hoping for probation; and that, when the four of them were in the car, the victim put his hand on her hand and said: "[Y]ou're my Angel, I love you." Jernigan also admitted during cross-examination that she had lied to the victim's mother several times after her son was killed and that she had lied to the law officers who had questioned her. Jernigan also admitted that, just before she had sex with appellant, she asked him "to get rid of" the victim. After she testified that she was "happy that she was pregnant with [the victim's] child," Jernigan admitted that she had "talked about getting an abortion."

*Corroboration of Accomplice Testimony*

■ Article 38.14 provides that a conviction based upon the testimony of an accomplice cannot be affirmed unless that testimony is "corroborated by other evidence *tending to connect* the defendant with the offense committed." (Emphasis added) The Court of Criminal Appeals discussed this statute in *Brown v. State,* 672 S.W.2d 487, 488 (Tex.Cr.App.1984):

A conviction cannot be had upon the testimony of an accomplice witness unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

The test to determine the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then examine the testimony of other witnesses to ascertain if there is inculpatory evidence which *tends to link* the accused with the commission of the offense. All the facts and circumstances in evidence may be looked to for corroboration, and the corroborative evidence may be circumstantial or direct. Furthermore, it is not necessary that the corroboration *directly link* the accused to the crime or be sufficient in itself to establish guilt. (Emphasis in original, Citations omitted)

Jernigan's testimony is corroborated by testimony from Joel Wayne Hewitt. Hewitt was in the Taylor County Jail (charged with two aggravated robberies) when he testified. Hewitt said that the State had not made any plea offers, that he was "kind of at the mercy of the Court," and that the district attorney asked him to testify and tell the truth.

Hewitt was 19 years old at the time of trial. Hewitt testified that he knew about the victim being killed, that he knew where

appellant and his brother lived, and that Goyne was "staying with them." Hewitt then testified that he was there the night that the victim was murdered. After he got off work, Hewitt went to appellant's house. Appellant, Goyne, Jernigan, and the victim were in the front bedroom with Hewitt. Appellant and Goyne told Jernigan that they wanted to talk to her in the kitchen. Hewitt stayed in the front bedroom with the victim. Later, Hewitt went to the kitchen to get a drink of water, and he heard Jernigan tell appellant and Goyne that "she was tired of [the victim]" and that "[the victim] was driving her up the wall." Hewitt then went back to the bedroom. Appellant, Goyne, and Jernigan came back to the bedroom and asked the victim "to go with them to pick up some guns and some drugs." Hewitt said that the victim did not want to go and that Goyne gave the victim "a syringe and a bump of methamphetamine." After they talked for about 30 minutes, Jernigan and the victim got up and went to her vehicle. Appellant got some "telephone wire" and stuffed it into his pants. Appellant and Goyne then went to Jernigan's vehicle. The four of them left the house about 1:00 a.m., and Hewitt tried to go to sleep. About 6:00 or 7:00 a.m., appellant, Goyne, and Jernigan came back to the house. The victim was not with them. Hewitt said that there was blood on Goyne's boots and that they had a pair of pants with them. They put the pants, a wallet, and a watch on the table. Hewitt said that he left the house to play Nintendo with a friend. Hewitt then went back to appellant's house and heard appellant talking to Goyne. Hewitt testified that: "They were scared that the cops were going to find out they killed [the victim]." Hewitt's testimony tends to connect appellant with the offense, and Hewitt was not an accomplice to the murder. *Brown v. State, supra.*

Points of Error Nos. 7 and 8 are overruled.

## Jury Argument on Parole Laws

Appellant's trial counsel[5] made a "Bill of Exception" before the closing arguments to the jury on punishment to show that he wanted to "explain to the jury the misconceptions that the general public have" about how "good time and parole eligibility" are concerned. Appellant's trial counsel said that he wanted to explain to the jury that "the prison system is not a revolving door" and that appellant would have to "flat time, that is day for day, 30 years or half his time, whichever is less, before he would become eligible for parole." The prosecutor said that he did not object to appellant's trial counsel arguing what the current statistics show.

The jury then returned to the courtroom, and the trial court read the charge to the jury. The prosecutor's opening jury argument reads in pertinent part as shown:

[PROSECUTOR]: May it please the Court.... At this time we start discussing with you punishment. As you know, the range is from five to 99 or life in prison or probation. *And I know [that defense counsel] and I are going to do something unusual because you know in there [in the charge] where it says don't do probation or don't do parole and stuff like that? [Defense counsel] is going to go over that because I think y'all should know that, okay? And if I agree to it, [defense counsel] agrees to it, he is going to explain to you that. If I've got any problems with*

5. Appellant's trial counsel testified that he was a board certified specialist in criminal law and that, since 1976, he had tried hundreds of criminal cases, both as a prosecutor and as a defense attorney.

*what he says on it then I will handle it in rebuttal, okay?*

[After discussing the State's position that it was a "senseless killing," that the jury should not consider probation, and that the jury should consider the "upper range, towards 99 years," the prosecutor discussed the statistics which had been furnished by defense counsel.]

\* \* \*

[PROSECUTOR]: If you give him 20 years, then ten years [later] the parole board can let him out. I am not saying that he can, I'm not saying they can't. But he gets to consider parole. So on the 11th year if he gets out and he's back to using drugs and he goes and kills somebody, *guess who is responsible? The 12 of you because you could have done something now and that's what—*

[DEFENSE COUNSEL]: Judge, I object to that as a misstatement. It is a misstatement of facts, it is a misstatement of the law. It's prejudicial and stated for no other reason than to inflame these people's minds.

THE COURT: Okay. Well, *I instructed the jury on what the law is,* and [prosecutor], *please argue within the law.*

[DEFENSE COUNSEL]: Judge, will you make a ruling on my objection. That's not a ruling.

THE COURT: *I overrule the objection.*

\* \* \*

[DEFENSE COUNSEL]: Good morning.... I want you to use your reasoning intelligence like you did on the capital part of the case. Don't do anything out of anger, rage, or resentment.

\* \* \*

And the judge has given you the full range of punishment, not less than five years nor more than 99 years or life. *As [the prosecutor] told you in trying to steal my thunder, 99 or life doesn't mean anything. If you wrote life in there, life in effect is 60 years, because the law says you have to do day for day one half or 30 years, whichever is less, and day for day means exactly that, day for day. No good time, no time off, no giving blood, no going and giving talks to little kids at school about the things to do to stay out of prison, day for day.*

\* \* \*

I know you are going to go out there and you are going to honestly evaluate this and look at it and be reasonable, but I would not give [appellant] one year more than the devil [the 10 years given to Jernigan].... It's not a swinging door down there. It may have been sometime in the past, I won't tell you that it wasn't, but it is not now. 3G offenses are doing 95 to 100 percent of their time, day for day.

\* \* \*

I appreciate your attention, and on behalf of his family, don't let anger, rage, or resentment do it. Find some mercy in that room. Thank you.

■ Points of Error Nos. 1, 2, and 3 are overruled because there was no objection to those portions of the State's argument to the jury. TEX.R.APP.P. 33.1(a) states the general rule that, as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court "by a timely request, objection, or motion."

■ Point of Error No. 4 is overruled because TEX.R.APP.P. 44.2(b) provides that any error, other than constitutional

error, "that does not affect substantial rights must be disregarded." Even though the trial court should have sustained the objection to the argument that the "12 of you" would be responsible if appellant gets out of prison on parole and "kills somebody," the trial court told the prosecutor to "please argue within the law"; and the prosecutor went on to a different subject. At the conclusion of the arguments, the court's written charge to the jury instructed the jurors:

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

### Proof of Extraneous Offenses

Appellant argues in Point of Error No. 5 that the trial court erred in allowing evidence of extraneous offenses because "the prejudicial effect of the evidence outweighed its probative value." Appellant argues in Point of Error No. 6 that the trial court erred in allowing proof of these offenses "because there was insufficient proof appellant participated therein." Both of these points refer to the same evidence. The State's first witness during the punishment phase of trial testified that she had seen appellant "choking" his girlfriend and that appellant had also assaulted her. There was no objection to this testimony. The State's second witness during the punishment phase of trial testified that he had taken appellant, Goyne, and the victim to a drug dealer's house and that it was their intention "to rob this drug dealer." There was no objection to this testimony. The State's third witness during the punishment phase of trial testified that appellant came to his house and talked to him "about cooking some dope."

There was no objection to this testimony. As noted earlier in this opinion, Rule 33.1(a) requires a timely objection to preserve a complaint for appellate review. Points of Error Nos. 5 and 6 are overruled.

### This Court's Ruling

The judgment of the trial court is affirmed.