FILED IN
COURT OF CRIMINAL APPEALS

March 24, 2015

ABEL ACOSTA, CLERK

PD1396-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/23/2015 11:28:07 PM
Accepted 3/24/2015 10:32:08 AM
ABEL ACOSTA
CLERK

**Cause No. PD-1396-14**

# IN THE TEXAS COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| **JON THOMAS FORD,** | § | |
| **Petitioner,** | § | |
| | § | **FROM THE** |
| | § | **FOURTH COURT OF** |
| **vs.** | § | **APPEALS** |
| | § | **SAN ANTONIO, TEXAS** |
| **THE STATE OF TEXAS,** | § | **04-12-00317-CR** |
| **Respondent.** | § | |

## PETITIONER'S BRIEF
## ON PETITION FOR DISCRETIONARY REVIEW

On appeal from Cause No. 2010-CR-7741
IN THE 186th DISTRICT COURT
BEXAR COUNTY, TEXAS

CYNTHIA EVA HUJAR ORR
Bar No. 15313350
GOLDSTEIN, GOLDSTEIN & HILLEY
310 S. St. Mary's St.
29th Floor Tower Life Bldg.
San Antonio, Texas 78205
210-226-1463
210-226-8367 facsimile
whitecollarlaw@gmail.com

ATTORNEY FOR PETITIONER

## PARTIES TO THE CASE

Representing the State of Texas, at Trial:

Susan D. Reed
Former District Attorney
Catherine Babbitt
L. Katherine Cunningham
Kirsta Leeberg Melton
Former Assistant District Attorneys
Paul Elizondo Tower
101 West Nueva, Fourth Floor
San Antonio, Texas 78205

Representing the State of Texas, on Appeal:

Susan D. Reed
Former District Attorney
Jay Brandon
Assistant District Attorney
Paul Elizondo Tower
101 West Nueva, Fourth Floor
San Antonio, Texas 78205

Petitioner: Jon Thomas Ford

Representing Jon Thomas Ford, Defendant, at Trial
Dick DeGuerin
Todd Ward
DeGuerin & Dickson
1018 Preston Ave. Seventh Floor
Houston, Texas  77002

Representing Jon Thomas Ford, Appellant, on Appeal:

Cynthia E. Orr
Goldstein, Goldstein & Hilley
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, Texas 78205

ii

The Honorable MARIA TESSA HERR, presided at trial formerly in the 186th Judicial District Court, Bexar County, San Antonio, Texas.

# TABLE OF CONTENTS

Parties to the Case ........................................................................................................ ii

Table of Authorities ...................................................................................................... v

Statement of the Case and Procedural History ........................................................... 1

Issues Presented ........................................................................................................... 1

    I.      Whether a warrantless search of involuntarily conveyed historical cell tower data is an illegal search

    II.    The Court of Appeal's holding, that cell tower data information conveyed from a phone involuntarily, is public information under the third party record doctrine; is contrary to *Richardson v. State*, 865 S.W.2d 844 (Tex. Crim. App. 1993)

    III.   The Court of Appeal's decision held the evidence is sufficient, applying a legal rubric expressly allowing speculation to sustain the conviction, in conflict with this Court's decision in *Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007)

Statement of Facts ....................................................................................................... 2

Summary of Argument ................................................................................................. 5

Argument ...................................................................................................................... 7

Conclusion and Prayer ............................................................................................... 14

Certificate of Compliance .......................................................................................... 15

Certificate of Service ................................................................................................. 15

## Appendix

*Ford v. State*, 444 S.W.3d 171 (Tex. App. – San Antonio 2014).

# TABLE OF AUTHORITIES

**Cases:**

*City of Ontario v. Quon*, 560 U.S. 746, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010)..... ...................................................................................................................... 11

*Coolridge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ...................................................................................................................... 11

*Ford v. State,* 444 S.W.3d 171 (Tex. App.-San Antonio 2014)....................... *passim*

*Gross v. State*, 380 S.W.3d 181 (Tex. Crim. App. 2012) ........................................ 12

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007).................................. iv, 1, 12

*In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't*, 620 F.3d 304 (3d Cir. 2010) ........................... 7

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)............ 12

*Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ............. 8

*Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).......... 8

*Madrigal v. State*, 347 S.W.3d 809 (Tex. App.—Corpus Christi 2011, pet. ref'd.)... ...................................................................................................................... 5, 13

*Richardson v. State*, 865 S.W.2d 844 (Tex. Crim. App. 1993) ............... iv, 1, 11, 12

*Riley v. California*, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) ........................... 8, 10

*Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) ................... 8

*Tracy v. Florida*, 152 So.3d 504 (Florida 2014)..................................................... 10

*United States v. Jones*, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012)..................... 7, 9, 10

*United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) .. 8, 11

*United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976)......... 10

**Rules, Statutes and Other:**

Article 1, Section 9 of the Texas Constitution ........................................................ 11

Fourth Amendment of the United States Constitution .......................................... 6-8

## Statement of the Case and Procedural History

Appellant, JON THOMAS FORD (hereinafter "Ford"), was convicted in the of murder and sentenced to forty (40) years imprisonment on February 24, 2012. 1CR23, 19RR89. The Fourth Court of Appeals affirmed his conviction with Justice Luz Elena D. Chapa dissenting. *Ford v. State,* 444 S.W.3d 171 (Tex. App.-San Antonio 2014). Justice Chapa found that Ford had a reasonable expectation of privacy in his physical movements and location, also rejecting the third party record; she would have reversed Mr. Ford's conviction because it was obtained with illegally seized evidence. Thereafter, this Court granted his petition for discretionary review ordering briefing on the three questions stated below.

## Issues Presented

I. Whether a warrantless search of involuntarily conveyed historical cell tower data is an illegal search.

II. The Court of Appeal's holding, that cell tower data information conveyed from a phone involuntarily, is public information under the third party record doctrine; is contrary to *Richardson v. State*, 865 S.W.2d 844 (Tex. Crim. App. 1993).

III. The Court of Appeal's decision held the evidence is sufficient, applying a legal rubric expressly allowing speculation to sustain the conviction, in conflict with this Court's decision in *Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007).

## Statement of Facts

As is set out in the majority, Mr. Ford's conviction for the murder of Dana Claire Edwards [hereinafter DE] was primarily based upon evidence from historical cell tower data [hereinafter HCD] ostensibly placing him at DE's condo. The State's theory was formed upon HCD, alleging that Ford uncharacteristically[1] flew into an unobserved rage following a conversation by others at a New Year's Eve ("NYE") party. It asserts, that Ford maintained this status for two hours at DE's place 12R168-74, unseen by a neighbor, Jordon Hasslocher; who knew Ford and who was outside all evening. 9R27, 45, 57-60.

The State places Ford at DE's condo and Olmos Dam with HCD. 18R75-76. (DE's condo 11:45pm, Gallery Court 1:19am and Olmos Dam at 1:32am). 18R75-76. But, Hasslocher, saw DE walking her dogs at 1:20am (15R182, 14R141), so she was not dead at 1:19am. The State says Ford disposed of DE's dog at Olmos Dam at 1:32am. But video shows DE's dog was alive the next morning. CR571, SX132a-n. The State chose an implausible time of death[2], to make HCD relevant. However, the HCD does not fit.

---

[1] Ford's friends describe him as peaceful his entire life. 17R160. He rarely loses his temper, even when provoked. 17R145. His active social life and his friends date back to his childhood. Id.

[2] DE attended the party with an alcohol and drank more at midnight. 7R193, 14R143. She left at 12:45am. 7R193. A body doesn't metabolize alcohol after death. 14R126, 142, 154. If she died at 1:19 am, she had less than one hour to metabolize it. Alcohol remains three hours. 15R179.

Ford left the NYE party at 11:30pm with others, 7R110, 7R191. He watched TV and retired at home, his cell phone with him. SX1-A. The State claimed video showed a person entering and exiting DE's condo, but that it was impossible to identify the person or the vehicles.12R171. The State argued HCD identified Ford's exact location, but its witness said the variables involved, the HCD cannot definitively identify a person's location. 8R145-146.

The State obtained "cellular site information" as well as contents of communications, SCR 196-97 with the SCA, without a search warrant. It stated that DE was found on 1/**2**/2009, but did not say when she died. The applications discusse the NYE party and video of a vehicle like Ford's without attaching any significance to it or verifying that it was Ford's. SCR180–199. The information is sought to "develop and/or confirm investigative leads…." SCR 196-97.

Finally, the State argued unremarkable touch DNA found on the edge of a guest towel proved Ford was present when DE was murdered. 6R37, 157-98. But, this towel was cross-contaminated (15R50-51) and had more of the expert's own DNA. 15R53, 16R176. More importantly, Ford stayed at DE's when they dated

---

DE's autopsy showed **no** traces of alcohol. 14R126. And vitreous shows traces of alcohol for about two hours longer than the rest of the body, and DE's vitreous showed no traces. 14R154.. Thus, DE was alive long enough to metabolize the alcohol she consumed that night and it is, therefore, impossible for DE's time of death to have been before 2:02am. The State's medical examiner concedes, the time of death could have been noon on 1/1/2009. 14R150-51. The defense' medical examiner established lividity and rigor placed her time of death sometime after 4:00am on 1/1/2009. 15R182.

and he had been there recently, cleaning up after her dogs and putting her to bed after she drank too much. 11R91-93; 6R102; 7R88-90. Police agreed Ford's DNA would have been all over the condo. 11R91-92.

DE's parents discovered her in her guest bathroom on 1/2/2009. 9R133, 147. They contacted police and waited alone at the scene. 9R141, 147. They contaminated the towel by handling it, 9R148, and police also left it behind for a week. 11R217. In photos, the towel is moved against the base of the toilet. CR564. The only touch DNA located was on the edge of this guest towel after an unproductive testing and its contamination with larger quantities of the scientist's own DNA. 15R64. The State contended the towel had been washed after Ford was in the condo. But, DE washed used linen and was unaware Ford used the towel. 9R94.

The police also did not preserve evidence and DE's parents controlled their access. 12R71. Evidence was not timely collected and was lost. 11R217, 6R30-31. The State admitted that the police "screwed up." 6R30-31.

The Court allowed a hole punch purchased online three years after DE's death, SX66, in evidence as a weapon. SX58, 9R168. But, "Det. Snow reported in his supplement report as finding no signs of forced entry, or **any** items missing." CR629.

4

The medical examiner testified the hole punch was only a possible weapon. 14R75. And the State speculated that Ford went back to DE's home to retrieve it, 18R79, to explain why HCD allegedly placed him at the condo at 3am. There was no evidence that a three-hole punch was used as a weapon.

The trial Court also admitted a power cord as a weapon (9R197) over objection (9R196). Again, the mother claimed this was missing, "[t]hree years after [DE] died" (9R196). SX66 does not have the "[f]abric or some pattern to whatever the ligature was," described in the autopsy report: "slightly irregular, possibly patterned inferior margin." 14R178, CR390, SX210.

"[T]estimony that is based solely on speculation and conjecture necessarily lacks probative value, and therefore fails to meet the relevancy requirement of the rules of evidence." *Madrigal v. State*, 347 S.W.3d 809, 813 (Tex. App.—Corpus Christi 2011, pet. ref'd.) But the Court of Appeals sustained Ford's conviction on these weapons, holding: "Speculation is a proper use of circumstantial evidence and a question of fact for the jury to resolve." *Ford v. State*, No. 04-12-00317-CR, 444 S.W.3d 171, 195 (Tex. App. – San Antonio 2014).

## Summary of Argument

Tracking of individuals' movement and location through historical cell tower data [HCD] implicates privacy concerns because such tracking reveals

information from areas where there is an expectation of privacy (in their homes) as well as associational information (whom and where they are visiting and what apps and information they use and obtain). HCD conveys more than electronic connection information or the phone numbers dialed into a phone as was addressed in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220(1979).

The United States Supreme Court has recognized that obtaining a great deal of location information implicates the Fourth Amendment because tracking an individual's movements over a long period exceeds what law enforcement would be able to do. In addition, five justices questioned the continued viability of the third party record doctrine in light of digital communication. Since cell phones convey a great deal more than mere digital contact and without the participation of the person who owns the cell phone, this information must be obtained with a search warrant. Such private information conveyed via cell phone will not be unavailable to law enforcement, but will merely require that they obtain a warrant. Currently, search warrants can be obtained with great efficiency.

Further, a jury verdict resting on pure speculation and conjecture is not sustainable. The Fourth Court of Appeals erred in allowing Ford's conviction to stand upon weapon evidence that was the product of pure speculation and conjecture. Weapons created out of the whole cloth, from pure speculation, are not properly used by a jury or a Court of Appeals to sustain a conviction.

## ARGUMENT

## Questions I and II are argued together

This case is particularly well suited to decide whether such data is deserving of Fourth Amendment protection, since it concerns only data involuntarily conveyed from Ford's telephone to the cell towers.

> "The records used by the State to pinpoint Ford's location on the night of Edwards's murder were determined from records of passive activity on his phone, i.e. he was not placing a call when his phone connected with the cell tower. Rather, the records relevant to the State's case, the 11:45 p.m. and 1:19 a.m. "pings" off of the Gallery Court tower, were from a missed call and text message, respectively, from Tarver." *Ford v. State*, 444 S.W.3d 171, 190 n. 2 (Tex. App.—San Antonio 2014).

The Third Circuit agrees that HCD is not "voluntarily" given by cell phone customers. In *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't*, 620 F.3d 304, 317 (3d Cir. 2010) ["[a] cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way."]

On NYE, much detail about one's life is gathered in a short period. Justice Sotomayor concurring in *United States v. Jones,* 132 S.Ct. 945, 956 (2011) stated that "even short term monitoring" implicates privacy and chills First Amendment[3]

---

[3] First Amendment protected matters must be described with scrupulous exactitude. *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

protected associational and expressive freedoms. It "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations" that can be obtained and searched for information from a service provider for "years into the future."

A Fourth Amendment search can be conducted without any physical intrusion, *U.S. v. Karo*, 468 U.S. 705, 712-713(1984); *Katz v. U.S.,* 389 U.S. 347, 353 (1967)[a listening device need not be placed within a telephone booth to implicate the Fourth Amendment], the Supreme Court also held that capturing thermal images of inside a person's residence constitutes a search because all aspects of information from a home are intimate details. *Kyllo v. U.S.*, 533 U.S. 27, 38 (2001).

A cell phone is "a pervasive and insistent part of our daily life, *Riley v. California,* 134 S.Ct. 2473, 2484 (2014), and conveys "far *more* than the most exhaustive search of a house: A phone not only contains in digital information from many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form…." Id. at 2491.

Comparing a cell phone to a rotary telephone is much like comparing a laptop to a typewriter; Yes, a laptop can produce a letter on a piece of paper just as a typewriter could, and yes, a modern day cell phone can make a call to another

person just as a rotary telephone could. But, a modern day cell phone and laptop can do so much more than their 20th century predecessors. In Ford, the cell phone conveyed what type of communication was occurring (automatic data, calls, or texts) and what Mr. Ford did in response to those communications (not answering, or checking messages at home, 3R14).

Thus, Justice Chapa's dissent correctly distinguishes a 1970s pen register from HCD. Justice Chapa states that, much like a cell phone is different from a cigarette pack, you can't tell what's in it by touch, HCD is different from a pen register, because HCD reveals so much more. It is, in fact, information within a cell phone besides the mere numbers dialed.

Justice Chapa' correctly analogized the search-incident-to-arrest doctrine in *Riley* to the Third Party Doctrine: "Similar to the way that the search-incident-to-arrest doctrine was ill suited to the digital data contained on cell phones seized during an arrest, the third-party doctrine is 'ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.'" *Ford v. State,* 444 S.W.3d 171, 202 (Tex. App.—San Antonio 2014)(*quoting U.S. v. Jones*, 132 S. Ct. 945 (2012) (Sotomayor, J. concurring).

The majority, leapt to the conclusion that because Ford voluntarily used AT&T, all information communicated to his provider and stored was voluntarily revealed and were not entitled any expectation of privacy. *Ford,* at 190.

Since none of the HCD was voluntarily conveyed, here, it is distinguishable from *United States v. Miller*, 425 U.S. 435 (1976)[bank deposits] and *Smith v. Maryland*, 442 U.S. 735 (1979)[number dialed on rotary phone]. *See Riley,* 134 S.Ct 2473 [cell phones "display data stored on remote servers rather than on the device itself"].

In *Jones, supra,* the Court recognized a reasonable expectation of privacy in digtal data obtained without a trespass. Justice Scalia stated that this may be "an unconstitutional invasion of privacy…." *Jones,* at 954. Justice Sotomayor noted, concurring, that, Justices Altio, Ginsburg and Bryer, said such searches will shape the evolution of societal privacy expectations. And that short-term monitoring implicated privacy because cheap data collection evades the ordinary checks that constrain law enforcement practices. Id. at 955-56.

Cell phones continually and automatically connect with towers, identifying the equipment, its electronic identification number, the location of the phone, the type of communication and what, if any, was Ford's response. All of this occurs unbeknownst to the user "while the cell phone is turned on regardless of whether a call is being placed." *Tracy v. Florida*, 152 So.3d 504, 507 n.1 (Florida 2014).

10

See also SX11 data is not the same as "the invoice received by the subscriber" and is information "not for use or disclosure."

The Fourth Amendment must advance with technology. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). And jurists must "proceed with care when considering … privacy expectations in" electronic communication devices.[4]

The States' witness testified HCD was "private" and "everybody has a reasonable expectation of privacy." 8R100-101. HCD note a number dialed and convey voicemail, texts and internet. 8R108-109.

Here, we are not dealing with a vehicle on a public road. This was information collected from inside Ford's home, information about data downloads and whether he responded to texts and calls. Like the presence of the beeper in Karo's home, *United States v. Karo,* 458 U.S. 705, 710, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), the HCD revealed Ford's presence, his pedestrian movements through a neighborhood, and checking voicemail at home.

Further, *Richardson v. State*[5] demands a warrant for information from Third-Party Records. *Richardson* held that using a pen register constitutes a "search"

---

[4] *City of Ontario v. Quon*, 130 S.Ct. 2619, 2629 (2010).
[5] *Richardson v. State*, 865 S.W.2d 944 (Tex. Crim. App. 1993).

11

under Article I, § 9 of the Texas Constitution.[6] Seven other states rejected *Smith v. Maryland.* See *Richardson, ,* at 950-951["the user has no practical alternative but to forego the use of the telephone all together."].

Further, *Richardson* consisted of voluntary activities while, here, there are passive activities.[7] But the Court affirmed Ford's conviction despite the inapplicability of the third party record doctrine. Ford's HCD should be afforded an expectation of privacy that society regards as reasonable. The warrantless search sustained on the anachronistic third party record doctrine should be held unconstitutional and his conviction reversed.

## Ground III.

The Court determines whether **evidence** is sufficient by reviewing it in the light most favorable to the verdict to determine whether a rational juror could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010). The rational juror is not permitted to draw conclusions based on speculation. *Hooper v. State,* 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Speculation may not seem entirely unreasonable, "but it is not sufficiently based on

---

[6] *See Id.* at 953 (vacating and remanding to the court of appeals to decide if the search was "'unreasonable' in the absence of probable cause."
[7] *Richardson* at 953.

facts or evidence to support a conviction beyond a reasonable doubt." *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012).

Ford's conviction was based on speculated weapons, time of death, Ford killing DE's dog, climbing an 8 foot wall, running to Olmos Dam, and return to DE's condo twice [to fit the HCD]. 9R168, 196; 14R150–51; 18R21.

The majority opinion stated that: "Such 'speculation' is a proper use of circumstantial evidence and a question of fact for the jury to resolve." *Ford,* at 195. However, "[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

This is precisely why, a power cord and three hole punch purchased three years after DE died, and that had none of the characteristics of the injuries was not proper to sustain the conviction. The injury to DE's head, was an "arced abrasion." CR390. The three-hole punch had linear edges. The cord [SX66] does not have the "[f]abric or some pattern to whatever the ligature was," described as: "slightly irregular, possibly patterned inferior margin." 14R178, CR390, SX120.

The speculation regarding Ford's imagined race to the Dam to dispose of a dog. The State said that it could provide no explanation for how Ford did this. 18R21, 79.

13

"Additionally, testimony that is based solely on speculation and conjecture necessarily lacks probative value, and therefore fails to meet the relevancy requirement of the rules of evidence." *Madrigal v. State*, 347 S.W.3d 809, 813 (Tex. App.-Corpus Christi 2011, pet. ref'd.)( This is why the power cord, garrote and other speculation was not proper evidence to consider in deciding whether to sustain the conviction.

## Conclusion and Prayer

For the above reasons, this Honorable Court should find that the State was required to obtain a search warrant for the HCD and that Ford's conviction cannot be sustained upon this illegally obtained evidence or upon the speculation permitted by the Court of Appeals.

Respectfully Submitted:

\_\_\_\_*/s/Cynthia E. Orr*_____
Cynthia E. Orr
Bar No. 15313350
GOLDSTEIN, GOLDSTEIN & HILLEY
310 S. St. Mary's St.
29th Floor Tower Life Bldg.
San Antonio, Texas 78205
210-226-1463
210-226-8367 facsimile
whitecollarlaw@gmail.com

Attorney for Petitioner,
JON THOMAS FORD

14

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document does comply with the word-count limitations of Tex. R. App. P. 9.4(i)(3) because it contains 3,723 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

By:__*/s/ Cynthia E. Orr*_____
CYNTHIA E. ORR

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above Petitioner's Petition for Discretionary Review has been sent *via* E-file.Texas.gov, as registered participants, on this the 23rd day of March, 2015 to the following:

Nicolas LaHood
District Attorney
Jay Brandon
Assistant District Attorney
Paul Elizondo Tower
101 West Nueva, Fourth Floor
San Antonio, Texas 78205
E-mail: jay.brandon@bexar.org,

____*/s/Cynthia E. Orr*_____
Cynthia E. Orr

# APPENDIX

Jon Thomas FORD, Appellant v. The STATE of Texas, Appellee

No. 04-12-00317-CR

COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO

444 S.W.3d 171; 2014 Tex. App. LEXIS 9159

August 20, 2014, Delivered
August 20, 2014, Filed

**NOTICE:** PUBLISH

**SUBSEQUENT HISTORY:** Petition for discretionary review granted by In re Ford, 2015 Tex. Crim. App. LEXIS 77 (Tex. Crim. App., Feb. 4, 2015)

**PRIOR HISTORY: [\*\*1]** From the 186th Judicial District Court, Bexar County, Texas. Trial Court No. 2010CR7741. Honorable Maria Teresa Herr, Judge Presiding.

**DISPOSITION:** AFFIRMED.

## CASE SUMMARY:

**OVERVIEW:** HOLDINGS: [1]-A rational jury could have found defendant guilty of murder, in violation of Tex. Penal Code Ann. § 19.02(b)(1) (2011), because witnesses testified that his car was not at home when it should have been, cell phone records proved he was in the vicinity of the victim's condominium at times relevant to her murder, and DNA evidence linked him to the towel covering the victim's face; [2]-The trial court did not err under Tex. Code Crim. Proc. Ann. art. 40.001 (2006) in denying defendant's motion for a new trial based on newly discovered evidence because evidence underlying potential "new" experts was not newly discovered; [3]-The trial court did not err under Tex. Code Crim. Proc. Ann. art. 36.28 in responding to the jury's note regarding the testimony of an expert because the testimony read back by the trial court included the expert's answer to the specific question.

**OUTCOME:** Judgment affirmed.

**CORE TERMS:** cell, phone, murder, tower, site, cord, overrule, new trial, condominium complex, juror, cellular, provider, opening statements, missing, jury argument, circumstantial, admissible, reasonable expectation of privacy, probable cause, next contends, detective's, suppress, exiting, abused, search warrant, continuance, towel, burden of proof, acquisition, disclosure

## LEXISNEXIS(R) HEADNOTES
Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses
Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of the Evidence
Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence
Evidence > Procedural Considerations > Burdens of Proof > Proof Beyond Reasonable Doubt

Evidence > Relevance > Circumstantial & Direct Evidence

**HN1** When reviewing the sufficiency of the evidence in a criminal case, an appellate court applies the legal sufficiency standard as set out in Jackson. Applying the Jackson standard, the appellate court views the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The appellate court is permitted to consider all of the evidence in the record, whether admissible or inadmissible, when making its sufficiency determination. In circumstances where the record supports conflicting inferences, the appellate court must presume the factfinder resolved any conflicts in favor of the verdict and defer to that determination. This presumption includes conflicting inferences from circumstantial evidence. Further, the appellate court may not re-evaluate the weight and credibility of the evidence nor may it substitute our judgment for that of the factfinder.

Evidence > Relevance > Circumstantial & Direct Evidence
Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > General Overview

**HN2** In Texas, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (2011). Even for an offense as serious as murder, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. In cases where the available evidence is circumstantial in nature, it is not necessary that every fact and circumstance point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.

Criminal Law & Procedure > Appeals > Standards of Review > Deferential Review > General Overview

**HN3** In the event of an evidentiary conflict, an appellate court must presume the jury resolved the matter in favor of the verdict and defer to that resolution.

Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > New Trial
Criminal Law & Procedure > Postconviction Proceedings > Motions for New Trial

**HN4** An appellate court reviews a trial court's ruling on a motion for a new trial for an abuse of discretion. The appellate court views the evidence in the light most favorable to the trial court's ruling and upholds the trial court's ruling if it was within the zone of reasonable disagreement. The appellate court may not substitute its judgment for the trial court's; rather, it is limited to deciding whether the trial court's ruling was arbitrary or unreasonable. Therefore, denying a motion for new trial is an abuse of discretion only when no reasonable view of the record could support the trial court's ruling.

Criminal Law & Procedure > Postconviction Proceedings > Motions for New Trial

**HN5** Under the Texas Code of Criminal Procedure, a new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial. Tex. Code Crim. Proc. Ann. art. 40.001 (2006). The Texas Court of Criminal Appeals interprets this provision to require the satisfaction of the following four-part test: 1) The newly discovered evidence was unknown or unavailable to the movant at the time of his trial; 2) The movant's failure to discover or obtain the evidence was not due to a lack of diligence; 3) The new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and 4) The new evidence is probably true and will probably bring about a different result on another trial. Reaching new and different opinions from the same foundational evidence does not render the evidence newly discovered, even if those new opinions may be material.

Criminal Law & Procedure > Postconviction Proceedings > Motions for New Trial
Criminal Law & Procedure > Juries & Jurors > Voir Dire > Questions to Venire Panel

**HN6** Generally, when a partial, biased, or prejudiced juror is selected without fault or lack of diligence on the part of defense counsel, who has acted in good faith upon the answers

given to him on voir dire not knowing them to be inaccurate, good ground exists for a new trial. However, because written questions are by nature vulnerable to misinterpretation, even questions that appear to be subject to only one interpretation, "diligent" counsel will not rely on written questionnaires to supply any information that counsel deems material. Counsel who does so otherwise is simply not diligent.

Criminal Law & Procedure > Juries & Jurors > Jury Questions to the Court > Appellate Review
Criminal Law & Procedure > Juries & Jurors > Jury Questions to the Court > Requests to Review Evidence
Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview

*HN7* Under Tex. Code Crim. Proc. Ann. art. 36.28, if a jury disagrees as to the statement of a witness, they may apply to the court to have read to them from the court reporter's notes that part of the witness's testimony in dispute. Tex. Code Crim. Proc. Ann. art. 36.28. An appellate court should not disturb a trial judge's decision under art. 36.28 unless a clear abuse of discretion, as well as harm, is shown. When the jury indicates a specific and limited portion of testimony to be read, a trial court does not abuse its discretion by providing only the requested information.

Criminal Law & Procedure > Juries & Jurors > Jury Questions to the Court > Requests to Review Evidence

*HN8* With regard to jury notes, a trial court must interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the re-reading accordingly.

Criminal Law & Procedure > Pretrial Motions & Procedures > Suppression of Evidence
Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > Motions to Suppress
Criminal Law & Procedure > Appeals > Standards of Review > Deferential Review > General Overview

*HN9* An appellate court reviews a trial court's ruling on a motion to suppress under a bifurcated standard. The appellate court gives almost total deference to the trial court's determination of facts, and reviews the trial court's application of the law de novo.

Criminal Law & Procedure > Search & Seizure > Electronic Eavesdropping > General Overview

*HN10* Tex. Code Crim. Proc. Ann. art. 18.21, § 5(a) (Supp. 2013) states that a court shall issue an order authorizing disclosure of records, or other information of a wire or electronic communication held in electronic storage if the court determines that there is reasonable belief that the information sought is relevant to a legitimate law enforcement inquiry.

Criminal Law & Procedure > Search & Seizure > Electronic Eavesdropping > Beepers & Pagers
Criminal Law & Procedure > Search & Seizure > Electronic Eavesdropping > Pen Registers & Trap-&-Trace Devices

*HN11* See Tex. Code Crim. Proc. Ann. art. 18.20, § 1(15).

Criminal Law & Procedure > Search & Seizure > Exclusionary Rule > Rule Application & Interpretation

*HN12* Tex. Code Crim. Proc. Ann. art. 38.23(a) (2005) states that no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas shall be admitted in evidence against the accused on the trial of any criminal case.

Criminal Law & Procedure > Search & Seizure > Electronic Eavesdropping > Warrants

*HN13* 18 U.S.C.S. § 2703(d) requires a government entity seeking a court order to offer specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material an ongoing criminal investigation.

Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > General Overview

*HN14* An appellate court reviews a constitutional issue under a de novo standard of review.

Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection
Criminal Law & Procedure > Search & Seizure > Expectation of Privacy

*HN15* If an individual knowingly exposes his activities to third parties, he surrenders protections under the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV, and, if the government is subsequently called upon to investigate his activities for possible violations of the law, it is free to seek out these third parties, to inspect their records, and to probe their recollections for evidence. Furthermore, the fortuity of whether or not the third party, acting at its own discretion, chooses to store the information makes no constitutional difference. Essentially, once an individual voluntarily exposes information to a third party, it can be used for any purpose, such as conveying it to law enforcement authorities.

Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection

*HN16* Like the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV, the Texas Constitution provides that the people shall be secure in their persons, houses, papers, and possessions, from all unreasonable seizures or searches. Tex. Const. art. I, § 9.

Criminal Law & Procedure > Appeals > Procedures > Briefs

*HN17* A conclusory statement in an appellate brief supported by neither argument nor authority presents nothing for review.

Criminal Law & Procedure > Search & Seizure > Search Warrants > Affirmations & Oaths > Sufficiency Challenges
Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > General Overview
Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection

*HN18* Where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV, requires that a hearing be held at the defendant's request. The first prong of the Franks holding requires a defendant to allege a deliberate falsehood, or the affiant's reckless disregard for the truth, and specifically point out that portion of the affidavit alleged to be false. The second prong of Franks requires a defendant to accompany her allegations of falsity with either an offer of proof, affidavit, or otherwise reliable witness statement, unless the absence of such support is satisfactorily explained. The third and final prong of Franks requires a defendant to prove that if the deliberately false sections of the affidavit are removed, the remainder of the "four corners" of the affidavit no longer presents probable cause to search a particular location.

Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > Totality of Circumstances Test
Criminal Law & Procedure > Appeals > Standards of Review > Deferential Review > Probable Cause Determinations

*HN19* Probable cause for a search warrant exists when, viewed under the totality of the circumstances, there is a fair probability that evidence of a crime will be found at the specified location. This is a flexible and non-demanding standard. Where a magistrate found probable cause, an appellate court applies a highly deferential standard of review due to the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search. The appellate court will uphold the magistrate's probable cause determination as long as the magistrate had a substantial basis for

concluding probable cause existed.

Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Evidence
Evidence > Procedural Considerations > Rulings on Evidence
*HN20* An appellate court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. An appellate court may hold a trial court abused its discretion only if its decision falls outside the zone of reasonable disagreement.

Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements
Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Evidence
Criminal Law & Procedure > Appeals > Reviewability > Waiver > Waiver Triggers Generally
Criminal Law & Procedure > Appeals > Reviewability > Waiver > Admission of Evidence
*HN21* An appellant affirmatively waives their right to have a trial judge determine the admissibility of evidence when they state "no objection" to the offered evidence. A party is not excused from the procedural requirement to object at trial to the admission of evidence even if the error involves a constitutional right. An appellant who did not object to the admission of evidence at trial waives any claim on appeal that the trial erred in admitting that evidence. Tex. R. App. P. 33.1.

Evidence > Relevance > Relevant Evidence
*HN22* Under the Texas Rules of Evidence, all relevant evidence is admissible, except as provided otherwise by constitution, statute, or other rules of evidence. Tex. R. Evid. 402.

Criminal Law & Procedure > Trials > Opening Statements
*HN23* During a criminal proceeding, the State has the statutory right to state to the jury the nature of the accusations against the defendant and the facts which are expected to be proved by the State in support thereof. Tex. Code Crim. Proc. Ann. art. 36.01(a)(3).

Criminal Law & Procedure > Trials > Motions for Mistrial
Criminal Law & Procedure > Trials > Closing Arguments > General Overview
Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Mistrial
*HN24* Only in extreme circumstances of incurable prejudice will mistrial be required. In evaluating whether a trial court abused its discretion by denying a mistrial for improper argument, an appellate court applies and balances the following three factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct.

Criminal Law & Procedure > Jury Instructions > Curative Instructions
Criminal Law & Procedure > Trials > Closing Arguments > General Overview
*HN25* Usually, an instruction to disregard an argument will cure any error caused by the improper argument.

Criminal Law & Procedure > Trials > Closing Arguments > General Overview
Criminal Law & Procedure > Appeals > Reversible Errors > Prosecutorial Misconduct
Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Tests
*HN26* Proper jury argument falls generally within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument made by opposing counsel; and (4) a plea for law enforcement. Error exists when an argument presents facts not supported by the record to the jury, but the error is not reversible unless, in light of the entire record, the argument is extreme or manifestly improper.

Criminal Law & Procedure > Trials > Closing Arguments > Defendant's Failure to Testify
Criminal Law & Procedure > Appeals > Reviewability > Waiver > Waiver Triggers Generally
Criminal Law & Procedure > Appeals > Reviewability > Waiver > Prosecutorial Misconduct
Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Prosecutorial Misconduct

The State's comment on a defendant's failure to testify violates the defendant's state and federal constitutional privileges against self-incrimination. However, a defendant's failure to object to a jury argument or failure to pursue an adverse ruling to an objection to a jury argument forfeits the defendant's right to complain about the argument on appeal.

Criminal Law & Procedure > Trials > Continuances
Criminal Law & Procedure > Pretrial Motions & Procedures > Continuances
Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements
HN28 The Texas Code of Criminal Procedure allows a continuance in a criminal action only upon the written motion of the State or of the defendant setting forth sufficient cause. Tex. Code Crim. Proc. Ann. art. 29.03. The Texas Court of Criminal Appeals explicitly refuses to recognize a due process exception to the rule requiring motions for continuances to be written and sworn in order to be preserved on appeal.

Criminal Law & Procedure > Discovery & Inspection > Discovery by Defendant > General Overview
Criminal Law & Procedure > Discovery & Inspection > Brady Materials > Duty of Disclosure
HN29 See Tex. Code Crim. Proc. Ann. art. 39.14(a) (2009).

Criminal Law & Procedure > Defenses > Burdens of Proof
HN30 When a defendant seeks to introduce evidence of an "alternate perpetrator," he must establish a sufficient nexus between that person and the crime. It is not sufficient for a defendant to merely proffer "unsupported speculation" that another person may have committed the crime. Specifically, when the evidence does not point to a particular individual as being responsible for the crime, the proffered evidence amounts to no more than mere speculation that another person may have committed the crime.

**COUNSEL:** For APPELLANT: Cynthia Hujar Orr, San Antonio, TX.

For APPELLEE: Jay Brandon, Assistant District Attorney, San Antonio, TX.

**JUDGES:** Opinion by: Marialyn Barnard, Justice. Dissenting Opinion by: Luz Elena D. Chapa, Justice. Sitting: Catherine Stone, Chief Justice, Marialyn Barnard, Justice, Luz Elena D. Chapa, Justice.

**OPINION BY:** Marialyn Barnard

## OPINION

**[*176]** AFFIRMED

A jury found appellant Jon Thomas Ford guilty of the offense of murder. Based on the jury's recommendation, the trial court sentenced him to forty years' imprisonment. Ford raises eighteen points of error on appeal, asking this court to reverse his convictions. We affirm the trial court's judgment.

### BACKGROUND

On December 31, 2008, Dana Clair Edwards attended a New Year's Eve party with her friends Melissa Federspill and Alan Tarver at the home of a mutual friend. Edwards's ex-boyfriend, Jon Thomas Ford, and other guests also attended the party. Edwards left the party after midnight and was seen walking her dog by a neighbor between 12:30 a.m. and 1:00 a.m. on January 1, 2009. Edwards's body was later discovered by her **[**2]** parents in the early hours of January 2, 2009. She was found lying face down on her bathroom floor with a white, blood-soaked towel covering her head. Although the autopsy revealed lacerations and blunt force trauma to her head, the cause of death was determined to be

strangulation by ligature sometime between the early morning hours and noon of January 1, 2009. After an investigation, Ford was arrested and charged with murdering Edwards.

Although Ford was at the same New Year's Eve party as Edwards, he did not stay until midnight to celebrate the new year. Ford left the party early because, according to testimony, he was offended by a comment made by Federspill during a group card game regarding his and Tarver's resistance toward marriage. According to Federspill, the subject of marriage "was one of the sticky spots for [Ford] and  **[*177]**  Dana Clair" during their dating relationship. When Tarver asked later in the evening why Ford left early, Ford responded by text message: "No longer fun."

According to Ford, he went straight home after the party and was asleep before midnight. The State presented evidence suggesting this was not true. At trial, the State presented circumstantial evidence linking **[**3]**  Ford to the murder, including: (1) the testimony of Ford's and Edwards's mutual friends, Federspill and Tarver, that Ford's SUV was not parked in his home's driveway after the New Year's Eve party; (2) historical cell phone data reflecting activity on Ford's phone in the vicinity of Edwards's condominium around the time of the murder; (3) pictures from a bank's ATM camera depicting a white SUV similar to Ford's and an unidentified figure entering Edwards's condominium complex around the time of the murder; and (4) Ford's DNA on the bloody towel covering Edwards's face.

After considering the evidence above, as well as other testimony and evidence presented at trial, the jury found Ford guilty of the offense of murder. The trial court sentenced Ford to forty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. After the trial court denied his motion for new trial, Ford perfected this appeal.

## ANALYSIS

On appeal, Ford raises eighteen points of error, contending: (1) the evidence is legally insufficient to support his murder conviction; (2) the trial court abused its discretion when it denied his motion for new trial, which was based on insufficient **[**4]**  evidence, newly discovered evidence, and the selection of an allegedly partial juror; (3) the trial court improperly responded to a jury note concerning the testimony of cell tower expert Kenneth Doll "regarding the possibility of a cell phone connection between tower SX 3155 (Gallery Court) & the residence at 333 Rosemary Ave"; (4) the trial court erred by failing to suppress historical cell phone records obtained from AT&T and used by the State to suggest Ford's proximity to Edwards's residence at the time of her murder; (5) the affidavits used to obtain the warrants to search Ford's home, vehicle, and obtain his DNA contained materially false statements and omissions; (6) the trial court improperly admitted into evidence a metal three-hole punch and cordless electric drill charge cord; (7) the State engaged in improper jury argument by calling Ford a liar during opening statements, allegedly shifting the burden of proof during closing argument, and commenting on Ford's failure to testify; (8) the trial court erroneously denied Ford's oral request for a continuance during trial; (9) the trial court erred by denying Ford's motion for independent examination of DNA evidence under Texas Code of Criminal Procedure article 39.14(a) **[**5]** ; and (10) the trial court erred by excluding "alternate perpetrator" evidence regarding a break-in at Edwards's parent's ranch house the day before the murder.

## Sufficiency of the Evidence

In his first point of error, Ford contends the evidence is insufficient to support his murder conviction. **HN1** When reviewing the sufficiency of the evidence in a criminal case, we apply the Supreme Court's legal sufficiency standard as set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Applying the *Jackson* standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a  **[*178]**  reasonable doubt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319). We are permitted to consider all of the evidence in the record, whether admissible or inadmissible, when making our sufficiency determination. *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *Green v. State*, 893 S.W.2d 536, 540 (Tex. Crim. App. 1995) ("If the sufficiency of the evidence is challenged following a

jury trial, appellate courts consider all of the evidence presented whether properly or improperly admitted."). In circumstances where the record supports conflicting inferences, we must presume the factfinder resolved any conflicts in favor of the verdict and defer to that determination. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App.2012); *see Jackson*, 443 U.S. at 318. This presumption **[\*\*6]** includes conflicting inferences from circumstantial evidence. *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Further, we may not re-evaluate the weight and credibility of the evidence nor may we substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

As mentioned above, Ford was convicted of the offense of murder. *HN2*In Texas, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tᴇх. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 19.02(b)(1) (West 2011). Even for an offense as serious as murder, "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In cases where the available evidence is circumstantial in nature, "it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 1993) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

Here, the State relied upon circumstantial evidence to convict Ford. Specifically, the State relied upon the testimony of Federspill and Tarver, cell phone records, ATM photographs, and DNA evidence to rebut Ford's alibi and connect him to the murder.

According **[\*\*7]** to the State's theory of the case, the chain of events that ultimately resulted in Edwards's murder began when Ford became upset at the New Year's Eve party. While guests were playing a card game at the party, Federspill made a comment to Ford and Tarver about their resistance or reluctance with regard to "marriage." Ford did not appreciate the comment. According to Federspill, Ford approached her after the comment, told her he did not appreciate it, and left the party shortly thereafter. Additionally, after Tarver texted Ford at 11:31 p.m. about his abrupt departure from the party, Ford responded, "No longer fun." Federspill explained that Edwards broke up with Ford because "[Edwards] mentioned to me that she was unhappy in the relationship, looking for her life to progress forward in terms of marriage and/or motherhood . . . She wanted to have kids and get married."

Despite Ford's claim that he went straight home and went to bed, both Tarver and Federspill testified they did not see Ford's white Chevy Tahoe parked in his driveway after midnight. The pair drove to Ford's home to deliver a cooler **[\*179]** Ford left behind at the party. Although Ford was known to occasionally park in a church **[\*\*8]** parking lot directly behind his home, Tarver testified he was "looking for it right there and I don't see it." Ford counters that Tarver did not see the Tahoe because it was parked in a dark corner of the church parking lot instead of its normal place directly behind his house. However plausible, we must presume the jury resolved this conflict in favor of the verdict and defer to that determination. *See Wise*, 364 S.W.3d at 903.

After using the testimony of Tarver and Federspill to prove Ford was not at home around the time of the murder as he claimed, the State turned to historical cell phone data obtained from Ford's cellular provider, AT&T, to determine where he in fact was in the early hours of January 1, 2009. The information revealed in the records includes: the date and time of a cellular device's usage; the type of usage; the number calling and called during the usage; the duration of the usage; and the exact location (latitude and longitude coordinates) of the tower that processed the usage of the cellular device. According to the State's historical cell data expert Kenneth Doll, an employee of AT&T, this data is collected even from passive activity on the cellular device — including letting a call **[\*\*9]** go to voicemail by not answering it — because even with passive activity:

> [T]he device acknowledged — the device acknowledged to the network that, yes, here I am, in this service area . . . If your phone rings, if the phone rings, it is in communication with our network and it has set up a communication path with the site *that it is best server*

[sic] *with*.

(emphasis added). As a result of collecting a cellular device's active and passive activity, Doll testified he is able to tell where a phone is located based upon the data gathered from cell towers. Regarding this case specifically and the tower servicing the area in proximity to Edwards's condo — referred to as "Gallery Court" at trial — Doll testified that "[i]f you were at the Gallery Court location and you had activity on your cellular device, this would be the sector it would be on." Additionally, Doll stated it would not have been possible for Ford's phone to show activity in the Gallery Court sector from his home address "because you don't have line of sight to [the Gallery Court Tower] . . . [s]o your device won't see that tower and that tower won't see your device."

At oral argument, Ford suggested Doll actually testified the tower reflected **[**10]** in the historical record is the one closest to the phone *placing* the call, instead of Ford's phone that was receiving the calls and text messages. In support of this argument, Ford directed the court to the record and our decision in *Wilson v. State* where historical cell phone records were used to track the movements of a murderer on the day of his crime. *See* 195 S.W.3d 193, 196 (Tex. App.—San Antonio 2006, no pet.). The record, despite citation to it by Ford, does not support this assertion. Even if the record could be construed as lending some passing support to the proposition advanced by Ford at oral argument, it would conflict with other portions of Doll's testimony. *HN3*⬆In the event of an evidentiary conflict, we must presume the jury resolved the matter in favor of the verdict and defer to that resolution. *See id*. Further, our decision in *Wilson* does not support Ford's argument. In *Wilson*, we held the trial court did not abuse its discretion by admitting the testimony of an expert regarding historical cell phone records over a challenge to the expert's qualifications. 195 S.W.3d at 202. In short, *Wilson*, despite Ford's contention at oral argument, is irrelevant here. *See id*. at 201-02.

 **[*180]** Despite Ford's novel contentions at oral argument, the historical cell phone data, **[**11]** as interpreted by the testimony of Doll at trial, supports the conclusion that Ford was not at his home on the morning of the murder as he claimed. Rather, the historical cell data reveals two communications, a missed call from Tarver at 11:45 p.m. and a text from Tarver at 1:19 a.m., both of which place Ford in the service area of Edwards's condo on the morning of her murder. In addition to this historical cell data placing Ford's phone, and presumably Ford himself, in close proximity to the crime scene at the relevant times, the State also presented pictures from an ATM camera that appear to show Ford's vehicle, and possibly Ford, entering Edwards's condominium complex.

Before introducing the recovered ATM camera photos, the State first admitted into evidence a photo of Ford's white Chevy Tahoe. The photo shows Ford's 2004 white Chevy Tahoe had black roof rails, which are generally used to tie down luggage, and a horizontal black stripe down the lower quarter of the Tahoe's side. Although these identifying features are certainly not unique to Ford's vehicle, the features are visible in the grainy ATM photographs and a reasonable juror could determine a vehicle similar to Ford's is **[**12]** depicted.

Even though the vehicle in the ATM photos was never conclusively identified as belonging to Ford, the State introduced ATM photos depicting a vehicle that is similar in appearance to Ford's white Chevy Tahoe (i.e. exhibiting the roof rails and/or black horizontal stripe) entering and exiting Edwards's condo complex around the time of the murder. In addition to photos of the vehicle, the State also introduced photos depicting a figure — claimed by the State to be Ford based on the figure's clothing, which allegedly matched what Ford wore that night — entering and exiting Edwards's condominium complex. The photos were presented to the jury as follows:

> 1.) Vehicle entering Edwards's condominium complex from the north at 11:24 p.m. on December 31, 2008.
> 2.) Vehicle exiting Edwards's condominium complex to the south at 11:26 p.m. on December 31, 2008.
> 3.) Vehicle driving past Edwards's condominium complex from the south at 11:36 p.m. on December 31, 2008.
> 4.) Vehicle entering Edwards's condominium complex from the north at 11:37 p.m. on December 31, 2008.

5.) Vehicle exiting Edwards's condominium complex to the north at 11:39 p.m. on December 31, 2008.

6.) Figure allegedly entering Edwards's **[\*\*13]** condominium complex from the north at 11:42 p.m. on December 31, 2008.

7.) Vehicle believed to be Edwards's red Chevy Tahoe entering the complex from the north at 12:47 a.m. on January 1, 2009.[1]

8.) Figure allegedly exiting Edwards's condominium complex to the north at 2:02 a.m. on January 1, 2009.

9.) Vehicle passing Edwards's condominium complex heading south at 2:07 a.m. on January 1, 2009.

10.) Vehicle entering Edwards's condominium complex from the south at 3:12 a.m. on January 1, 2009. This photo only reveals the vehicle's back end and lit taillights. It does not depict a vehicle possessing similar identifying characteristics to Ford's, i.e. the roof rails and black side stripe are not visible.

11.) Vehicle exiting Edwards's condominium complex to the south at 3:16 **[\*181]** a.m. on January 1, 2009. Unlike the other photos, the vehicle exiting Edwards's complex does not have its headlights on.

The State argued to the jury that this timeline of events, based on the ATM photos, is evidence of Ford's activities on the night of Edwards's murder. Although Ford countered the State's timeline by introducing ATM photographs of other SUVs driving past the entrance to Edwards's condominium complex at times **[\*\*14]** relevant to the case, we presume the jury resolved any of the conflicts in favor of the verdict and must defer to that determination. *See Wise*, 364 S.W.3d at 903.

---

**FOOTNOTES**

[1] The record reflects Edwards drove a red Chevy Tahoe.

---

The last piece of evidence the State used to link Ford to Edwards's murder was the identification of his DNA on the white towel found covering her face at the murder scene. The State's forensic expert, Robert Sailors, testified Ford was the source of human male DNA extracted from samples of the towel removed from Edwards's face. Although Ford presented numerous attacks on the weight and credibility of this evidence (e.g., Ford's DNA on the towel is unremarkable as a former boyfriend and guest of Edwards's condo; the towel is contaminated evidence because Sailor's DNA was also identified on it), we must once against presume the jury resolved any evidentiary conflicts in favor of the verdict and defer to that determination. *See Wise*, 364 S.W.3d at 903.

Taken together, the State introduced evidence strongly suggesting Ford was not home at the time of Edwards's murder as he said, but rather was at the scene of the crime. Specifically, the State used the testimony of Federspill and Tarver to show Ford's car was not at home **[\*\*15]** when it should have been, cell phone records to prove he was in the vicinity of Edwards's condominium at times relevant to her murder, ATM photos showing a vehicle similar to Ford's entering and exiting the condominium complex around the time of the murder, and DNA evidence linking Ford with the towel covering Edwards's face. Although Ford has diligently argued the evidence presented by the State is neither perfect nor without conflict, our standard of review for the sufficiency of the evidence does not weigh in Ford's favor because we must presume conflicts are resolved in favor of the verdict. *See id*.

Having reviewed the record in the light most favorable to the verdict, we hold the jury rationally could have found Ford guilty of murder beyond a reasonable doubt. *See Carrizales*, 414 S.W.3d at 742. The combined and cumulative force of the incriminating circumstances presented by the State point toward Ford's guilt. *See Temple*, 390 S.W.3d at 359-60. Accordingly, we overrule Ford's first point of error.

Ford counters this conclusion by arguing there is a hole in the State's storyline that is supported by the very cell phone evidence used to convict him, evidence that renders the circumstantial evidence presented by the State insufficient. Ford **[\*\*16]** points out the cell phone records indicate he was in

the proximity of Olmos Dam at 1:32 a.m. on the morning of Edwards's murder because his cell phone recorded activity from a tower in that area. Those same cell records indicate that only 13 minutes earlier, at 1:19 a.m., Ford was in the vicinity of Edwards's condo a few miles away. Problematically, the ATM photos used by the State do not show Ford leaving in the same manner as the State alleges he entered the complex, i.e., walking in the front entrance. The State had no explanation for this apparent conflict and admitted as much during its closing: "[w]ill I ever be able to tell you precisely how the Defendant got over the [Gallery Court] wall or why the Defendant got over the wall? No. No." However, as stated **[\*182]** above, we must presume the jury resolved this conflict in the evidence in favor of the verdict and defer to that determination, as we have already done on other occasions. *See Wise*, 364 S.W.3d at 903.

In a further attack on the sufficiency of the evidence, Ford directs the court, for the first time in its reply brief, to a Court of Criminal Appeals decision where the court reviewed a set of circumstantial facts and determined that "[w]hile these facts together **[\*\*17]** might create suspicion, . . . they do not add up to probable cause that appellant committed the murders." *Hankins v. State*, 132 S.W.3d 380, 389 (Tex. Crim. App. 2004). Ford argues that if the Court of Criminal Appeals could not find probable cause under the facts in *Hankins*, then this court would err to find the present facts sufficient to support Ford's guilt. This argument is not persuasive as the *Hankins* case is completely distinguishable. Hankins involved a determination of the existence of probable cause, a standard inapplicable to the sufficiency review we apply here. *Compare id*. (determining existence of probable cause), *with Carrizales*, 414 S.W.3d at 742 (setting out standard of review for sufficiency of evidence).

**Motion for New Trial**

In his second point of error, Ford contends the trial court abused its discretion when it denied his motion for new trial. Specifically, Ford argues the trial court erred because: (1) the evidence was insufficient to establish Ford's guilt; (2) newly discovered evidence regarding the historical cell phone data and the ATM pictures tends to exculpate Ford; and (3) it was discovered that a juror allegedly lied about his knowledge of cell towers on his juror selection form.

*HN4* We review a trial court's ruling on a motion for new trial for **[\*\*18]** an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). "We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Id*. We may not substitute our judgment for the trial court's, rather we are limited to deciding whether the trial court's ruling was arbitrary or unreasonable. *Id*. Therefore, denying a motion for new trial is an abuse of discretion only when no reasonable view of the record could support the trial court's ruling. *Id*.

**Sufficient Evidence**:

Ford first argues the trial court abused its discretion by denying his motion for new trial because the evidence was insufficient to sustain his conviction. This argument is identical to Ford's first point of error on appeal. As we held above, the evidence is sufficient to support Ford's conviction, and we therefore overrule this portion of Ford's second point of error.

**"New" Evidence**:

Ford next argues he should have been given a new trial because of newly discovered evidence. *HN5* Under the Texas Code of Criminal Procedure, "a new trial *shall* be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (West 2006) (emphasis **[\*\*19]** added). The Texas Court of Criminal Appeals has interpreted this provision to require the satisfaction of the following four-part test:

> 1.) The newly discovered evidence was *unknown* or *unavailable* to the movant at the time of his trial;
>
> 2.) The movant's failure to discover or obtain the evidence was not due to a lack of

diligence;

3.) The new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and,

 **[*183]**  4.) The new evidence is probably true and will probably bring about a different result on another trial.

*Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002) (emphasis added).

Here, Ford contends he presented newly discovered, material evidence entitling him to a new trial. The new evidence includes: (1) an expert to counter Doll's testimony as to whether historical cell tower data can establish a phone's approximate location; and (2) an expert to testify that the figure seen in the ATM photos entering the Gallery Court complex could not have been Ford because the figure was too tall. The State counters Ford's claims by arguing this evidence is not actually "new." We agree.

The evidence underlying the potential "new" experts is not, in fact, newly discovered. Ford had access to the historical cell data **[**20]**  records from AT&T and the ATM images used by the State before the start of trial. Reaching new and different opinions from the same foundational evidence does not render the evidence newly discovered as required by *Keeter*, even if those new opinions may be material. *See id*. Accordingly, we overrule this portion of Ford's second point of error.

**Allegedly Impartial Juror**:

Ford's final argument regarding his motion for new trial concerns juror number 66. According to Ford, a court deputy overheard juror 66 admit after trial that he did in fact have experience and knowledge about cell phone towers due to his training and experience with his job at H.E.B. Ford contends this contradicted the juror's answer on the juror questionnaire. On the questionnaire, potential jurors were asked whether they "had any experience, training or education in: criminal law, autopsies, DNA, forensics, *cell phone towers*, [etc.]." (Emphasis added). Juror 66 answered "No."

Ford contends having juror 66 on the jury deprived him of a fair trial because juror 66 is biased regarding the historical cell data relied upon by the State. *HN6*⚓Generally, "when a partial, biased, or prejudiced juror is selected without fault or **[**21]**  lack of diligence on the part of defense counsel, who has acted in good faith upon the answers given to him on voir dire not knowing them to be inaccurate, good ground exists for a new trial." *Franklin v. State*, 12 S.W.3d 473, 478 (Tex. Crim. App. 2000) (quoting *Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim. App. 1978)). However, because "written questions are by nature vulnerable to misinterpretation — even questions that appear to be subject to only one interpretation," the Court of Criminal Appeals has said "'diligent' counsel will not rely on written questionnaires to supply any information that counsel deems material." *Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999). "Counsel who does so otherwise is simply not diligent." *Id*. (holding counsel was not diligent when he did not follow up on answers to written questionnaire with more specific questioning during voir dire.).

Here, we have not located a single instance where Ford's trial counsel specifically questioned the venire about cell phones or cell towers during voir dire. Therefore, we hold trial counsel was not diligent during voir dire, *see id*., and Ford may not now claim he deserves a new trial because an allegedly biased juror was selected without fault or *lack of diligence* on the part of his counsel. *See Franklin*, 12 S.W.3d at 478 (emphasis added). Accordingly, we overrule this portion of Ford's second point **[**22]** of error.

**Jury Note**

Ford next contends the trial court erred by insufficiently responding to the following jury note at trial:

 **[*184]**  Jurors have a dispute concerning the testimony of AT&T expert, Ken Doll, regarding the possibility of a cell phone connection between tower SX 3155 (Gallery Court)

& the residence at 333 Rosemary Ave.

*HN7*Under Texas Code of Criminal Procedure article 36.28, if the jury disagrees as to the statement of a witness, they may apply to the court to have read to them from the court reporter's notes that part of the witness's testimony in dispute. TEX. CODE CRIM. PROC. ANN. art. 36.28. This court should not disturb a trial judge's decision under article 36.28 unless a clear abuse of discretion, as well as harm, is shown. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005). When the jury indicates a specific and limited portion of testimony to be read, a trial court does not abuse its discretion by providing only the requested information. *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994). Here, Ford contends the trial court improperly limited the amount of Doll's testimony read back to the jury in response to its note.

In response to Ford's objection, the trial court clarified its decision before actually rereading Doll's testimony to the jury, stating:

> Well, in light of the way the question was phrased, it was fairly specific. And although I understand that generally **[**23]** it covers some of the issues, but it's in very general terms, and so I have narrowed that request to Page 67, Line 4 through Page 68 of Line 8, which covers the same issue but with more specificity, based on the question that was presented by the jury. So your objection is duly noted for the record and the request is denied.

The trial court's reasoning appears in line with the Court of Criminal Appeals' directive *HN8*regarding jury notes: "the trial court must then interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the re-reading accordingly." *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994). After explaining its decision to Ford, the trial court proceeded to read back Doll's testimony concerning the specific issue of whether Ford's phone could connect with the Gallery Court tower from his home on 333 Rosemary Ave. The testimony included cross examination by Ford's counsel regarding, among other things, the cell tower technology available at the time in question, as well as Doll's "line of sight" rationale for why the connection with Gallery Court was impossible.

Ford contends the trial court's rereading was insufficient because it excluded the following testimony that arguably **[**24]** impeaches Doll's response to the specific question regarding the Gallery Court tower:

> Q: As a general principle, you cannot tell this jury that if the record shows that a certain sector of a cell tower was pinged by a cell device, that that cell device was in that sector beyond any argument, can you?
>
> A: No.
>
> Q: And that's because depending on a number of variables, a different cell tower or a different sector might service that activity?
>
> A: Yes.
>
> . . .
>
> Q: Okay. Let's put that together. So even though the records show a cell tower and a sector to the cell tower, that does not mean beyond all doubt that the cell device was in that sector, does it?
>
> A: There are cases where you can set up a call on a cell site that is not the closest cell site to you, or you could potentially even set up a cell — a call on a cell site across town, but those are very **[*185]** rare and I would say that they're — there — there's a lot of variables in there.

Although this testimony does seem to impeach Doll's testimony regarding the possibility of a cell phone connection between the Gallery Court tower and Ford's residence, we hold the excluded cross examination above is not responsive to the jury's specific inquiry. The jury **[\*\*25]** asked specifically about the possibility of a "cell phone connection between tower SX 3155 (Gallery Court) & the residence at 333 Rosemary Ave.," and the testimony read back by the trial court included Doll's answer to that specific question, i.e., it is impossible because the tower did not have line of sight with the residence. The testimony proffered by Ford addresses the issue as a broad general principle and not as a response to the jury's specific question. Accordingly, we hold the trial court did not clearly abuse its discretion in responding to the jury's note as it did. *See Howell*, 175 S.W.3d at 792.

## Historical Cell Phone Data — Location Information

Across six points of error, Ford argues the State improperly acquired and used historical cell phone data collected by AT&T to connect him to Edwards's murder. AT&T's records regarding Ford's cell phone were acquired by the State pursuant to a court order under Texas Code of Criminal Procedure article 18.21, not by search warrant. *See* Tex. Code Crim. Proc. Ann. art. 18.21, Sec. 5(a) (West Supp. 2013). Ford contends this action by the State was improper and violated his rights because: (1) the State obtained the historical cell phone records in violation of Texas Code of Criminal Procedure article 18.21; (2) the State violated Texas Code of Criminal Procedure article 38.23; (3) the State violated Article I, section 9 of the Texas Constitution; (4) the State violated 18 U.S.C. § 2703; (5) the State violated **[\*\*26]** the Fourth Amendment's prohibition against unreasonable searches and seizures; and (6) the State violated the First Amendment's protection regarding the right to freely associate.

At trial, Ford contested the admissibility of the cell phone records with a motion to suppress, which the court denied. *HN9*⬆We review a trial court's ruling on a motion to suppress under a bifurcated standard. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). We give almost total deference to the trial court's determination of facts, and review the trial court's application of the law de novo. *See State v. Mendoza*, 365 S.W.3d 666, 669 (Tex. Crim. App. 2012); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). Here, both Ford and the State agree the trial court rendered a legal ruling affecting Ford's constitutional rights, and therefore this court should apply a *de novo* standard of review. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). We agree.

Ford has made two types of challenges to the historical cell site data obtained and used by the State. First, Ford challenges the acquisition of the data based on statutory law concerning court orders to obtain such data. Second, Ford challenges the acquisition of the data without a search warrant, even if the acquisition is authorized by statute without a warrant.

*Statutory Arguments*

Ford raises three statutory arguments with regard to the manner in which the State obtained historical records of his **[\*\*27]** cell phone use from AT&T contending: (1) the applications did not comply with Texas Code of Criminal Procedure article 18.21; (2) the applications violated Texas Code of Criminal Procedure article 38.23; and (3) **[\*186]** the applications were insufficient under 18 U.S.C. § 2703.

## Texas Code of Criminal Procedure Article 18.21

Ford contends the State improperly obtained his historical cell phone records from AT&T by obtaining a court order pursuant to article 18.21, section 5(a) of the Texas Code of Criminal Procedure. *HN10*⬆ Section 5(a) states "[a] court shall issue an order authorizing disclosure of . . . *records*, or other information of a wire or electronic communication held in electronic storage if the court determines that there is reasonable belief that the information sought is relevant to a legitimate law enforcement inquiry." Tex. Code Crim. Proc. Ann. art. 18.21, Sec. 5(a) (emphasis added). Here, Ford argues the information requested by the State was not a "wire or electronic communication" encompassed by the statute. This argument does not comport with his article 18.21 based argument made before the trial court.

At trial, Ford argued that the assistant district attorney who signed the application was not the "prosecutor" authorized to file the application under article 18.21(2)(b). *See* Tex. Code Crim. Proc. Ann. art. 18.21(2)(b) ("A prosecutor may file . . ."). Ford contended the term "prosecutor" referred only to the actual district attorney herself, an argument rejected by the trial court. Because this article 18.21 argument does not comport with Ford's **[**28]** complaint on appeal, we hold Ford did not preserve this point of error, and his current argument cannot be raised for the first time on appeal. *See, e.g., Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014). However, even if Ford had properly preserved his present argument for our review, it still fails.

Article 18.20 defines "electronic communication" for the purposes of the order as *HN11* "a transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system." Tex. Code Crim. Proc. Ann. art. 18.20, Sec. 1(15). We hold the information collected by the State in this case is AT&T's records of the transfer of signs, signals, and data from Ford's cellular phone serviced by AT&T and falls within the definition of an "electronic communication" subject to disclosure via court order. *See id*. Ford attempts to distinguish the information obtained by the State as "cellular site information" concerning connection and location data that is not "intelligence of any nature" referenced by article 18.20, Section 1(15); however, this argument is without merit because it ignores the full scope and definition of "electronic communication" set out above. Accordingly, we overrule this complaint and hold the records acquired **[**29]** from AT&T were obtained pursuant to a proper order under article 18.21. *See id*.

**Texas Code of Criminal Procedure Article 38.23**

Ford next contends the State's applications to obtain historical cell site data from AT&T violate Texas Code of Criminal Procedure article 38.23. *HN12* Article 38.23(a) states that "no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas . . . shall be admitted in evidence against the accused on the trial of any criminal case." Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005). According to Ford, because the State's applications were not authorized by article 18.21, the use of the evidence against him violates article 38.23. However, as we held above, the records from AT&T do not violate article 18.21. Therefore, article 38.23 cannot serve as a basis to exclude the evidence used against Ford.

 **[*187]  Required Disclosure of Customer Records under 18 U.S.C. § 2703**

Ford next contends the State's applications were inadequate under federal law, which requires the government to show the existence of an ongoing investigation to obtain the court order. *See* 18 U.S.C. § 2703 (2009) ("A court order for disclosure under subsection (b) or (c) may be issued [if] . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."). Ford contends the applications are deficient because the State needed to illustrate an **[**30]** ongoing investigation but they "do not use this language." There are two problems with Ford's appellate argument.

First, Ford did not make this argument in either his written motion to suppress or during the hearing on the motion. The closest Ford came to making this argument before the trial court is when he argued during the hearing that obtaining the cell data "must be done with a warrant . . . [b]oth the State and federal statutes say that." Accordingly, we hold Ford did not preserve this ground for our review. *See* Tex. R. App. P. 33.1. However, even if Ford did preserve his argument under section 2703, it fails on the merits.

*HN13* Section 2703 requires the government entity seeking the court order to offer "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material an ongoing criminal investigation." 18 U.S.C. § 2703(d). Both of the State's applications contain a subsection "IV" that not only describes the information requested as "relevant to the investigation of a

criminal offense," but also sets out the self-described "supporting information/'specific and articulable fact(s)'." This section includes **[\*\*31]** information provided by investigating detective Leroy Carrion explaining the background of the case against Ford and why the State needed his cellular records. Having reviewed the State's applications, we hold they comply with the showing of an ongoing investigation required by section 2703(d). *See* 18 U.S.C. § 2703(d).

*Constitutional Arguments*

Ford also contends, in addition to his statutory claims, that the State unconstitutionally obtained his cellular records from AT&T without a search warrant. Specifically, Ford contends the State's warrantless acquisition of the records from AT&T violated his constitutional rights under: (1) the Fourth Amendment to the United States Constitution; (2) Article I, section nine of the Texas Constitution; and (3) the First Amendment of the United States Constitution.

**Fourth Amendment**:

Ford contends the State's acquisition of his historical cell site records from AT&T without a search warrant violated the Fourth Amendment's prohibition against unlawful searches and seizures. *See* U.S. Const. amend. IV. Specifically, Ford relies on the Supreme Court's decision in *U.S. v. Jones*, 132 S.Ct. 945, 181 L. Ed. 2d 911 (2012), to argue individuals have a reasonable expectation of privacy "in our technologically advanced tools that also reveal our locations." As discussed above, *HN14* we review this constitutional issue under a *de novo* standard of review. *See Wall*, 184 S.W.3d at 742.

In *Jones*, the police attached a Global-Positioning-System (GPS) tracking device to an individual's **[\*\*32]** vehicle without a valid warrant. *Jones*, 132 S.Ct. at 947. The police then used the GPS device to track the vehicle's movement for the next twenty-eight days. *Id*. Applying a trespass theory of Fourth Amendment protection, **[\*188]** the Supreme Court held that attaching a GPS tracking device to a vehicle without a warrant and using the device to record the vehicle's location was an impermissible search under the Fourth Amendment. *See id*. at 949. However, the facts in this case distinguish it and remove it from *Jones*'s purview. Here, the State did not initially gather the information sought to be suppressed. Rather, a third-party, AT&T, gathered and maintained the information as business records of the service provided to Ford's phone. As the Fifth Circuit recognized when addressing a similar Fourth Amendment issue, the "question of who is recording an individual's information initially is key." *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 610 (5th Cir. 2013).

Relying on and concurring with the Fifth Circuit's analysis, the Fourteenth Court of Appeals recently held a defendant's reasonable expectation of privacy under *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) and its progeny was not violated when the State obtained cell tower records from a third party without a warrant. *See Barfield v. State*, 416 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In *Barfield*, the State offered third-party cell tower records obtained without a warrant to establish **[\*\*33]** the defendant's whereabouts during times relevant to the crime — just as the State did in this case. *See id*. at 745. According to the Fourteenth Court of Appeals, this action did not violate the defendant's Fourth Amendment rights because *HN15* if "an individual knowingly exposes his activities to third parties, he surrenders Fourth Amendment protections, and, if the Government is subsequently called upon to investigate his activities for possible violations of the law, it is free to seek out these third parties, to inspect their records, and to probe their recollections for evidence." *Id*. at 748 (quoting *In re U.S. for Historical Cell Site Data*, 724 F.3d at 610); *Reporters Comm. For Freedom of Press v. Am. Tel. & Tel. Co*., 593 F.2d 1030, 1043, 192 U.S. App. D.C. 376 (D.C. Cir. 1978). Furthermore, the fortuity of whether or not the third party, acting at its own discretion, chooses to store the information makes no constitutional difference. *Barfield*, 416 S.W.3d at 748 (citing *In re U.S. for Historical Cell Site Data*, 724 F.3d at 610); *Smith v. Maryland*, 442 U.S. 735, 745, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)). Essentially, once an individual voluntarily exposes information to a third party, it can be used for any purpose, such as conveying it to law enforcement authorities. *Barfield*, 416 S.W.3d at 748 (citing *In re U.S. for Historical Cell Site Data*, 724 F.3d at 610); *S.E.C. v. Jerry T. O'Brien, Inc*., 467 U.S. 735, 743, 104 S. Ct. 2720, 81 L. Ed. 2d 615 (1984) ("[W]hen a person communicates information to a third party even on the understanding that

the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities.")); *see also United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976).

Applying the precedent above, Ford cannot **[\*\*34]** successfully complain about the State's warrantless retrieval of the AT&T records. The cell site data acquired by the State is simply the business records memorializing Ford's voluntary subscriber transaction with AT&T for the service he wanted from his cellular provider all along, i.e. the ability to transmit and receive data on AT&T's network of cell towers. *See Barfield*, 416 S.W.3d at 748. The fact that this data happens to reveal the general location of Ford's cell phone, and presumably himself, at given points in historical time is of no consequence to the legal analysis here. Accordingly, we overrule this issue and hold the State's actions did **[\*189]** not violate Ford's Fourth Amendment rights because he could not have a reasonable expectation of privacy in information he voluntarily conveyed to a third party. *See id*. at 746-48.

Ford contends that this result, based on his supposed voluntary disclosure of information to a third party, is improper. Specifically, Ford argues: (1) the Court of Criminal Appeals has rejected the legal premise that a voluntary disclosure of information to a third party destroys a reasonable expectation of privacy in said information; and (2) he did not voluntarily disclose his *location* information to his service **[\*\*35]** provider. We disagree.

One of the seminal Supreme Court cases for the legal analysis applied above is *Smith v. Maryland*. 442 U.S. 735, 745, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979). In *Smith*, the Supreme Court held the petitioner had no Fourth Amendment, legitimate expectation of privacy in the pen register kept by his phone provider because:

> When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed.

*Id*. at 744. The Court of Criminal Appeals has expressly stated *Smith*'s proposition represents "an erroneous belief" of voluntarily assumed risk defeating a reasonable expectation of privacy in dialed phone numbers. *Richardson v. State*, 865 S.W.2d 944, 951-52 (Tex. Crim. App. 1993). Ford contends, therefore, this court may not rely on the third-party doctrine applied in federal courts.

Unlike the Supreme Court's decision in *Smith*, the *Richardson* decision does not concern an individual's protection under the Fourth Amendment; rather, the Court of Criminal Appeals was determining whether the use of a pen register constitutes a "search" under Article I, section 9 of the *Texas Constitution. See Richardson*, 865 S.W.2d at 953. After examining *Smith*, the court stated "society recognizes as objectively reasonable the expectation **[\*\*36]** of the telephone customer that the numbers he dials as a necessary incident of his use of the telephone will not be published to the rest of the world." *Id*. However, this proclamation is regarding the Texas Constitution, as opposed to the Fourth Amendment of the United States Constitution that Ford is invoking here. Accordingly, we reject Ford's argument.

In addition to his argument based on *Richardson*, Ford also attacks the third-party disclosure theory on the ground that he did not voluntarily disclose his location information to AT&T, which cases like *Smith* require for a forfeiture of protected privacy interests. *See Smith*, 442 U.S. at 743-44 (noting "[t]his Court consistently has held that a person has no legitimate expectation of privacy in information he *voluntarily* turns over to third parties" (emphasis added)). In support of this argument, Ford directs the court to authority for the proposition that an individual placing or receiving a call on a cell phone has not voluntarily exposed their location information. *See United States v. Davis*, 754 F.3d 1205, 2014 WL 2599917 at \*10 (11th Cir. 2014); *In re App. of the U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*., 620 F.3d 304, 317 (3d Cir. 2010); *In re App. of the U.S. for an Order Auth. the Release of Hist. Cell-Site Info*., 809 F.Supp.2d 113, 127 (E.D.N.Y. 2011). The Fifth Circuit, responding to the same argument raised by the ACLU in *U.S. for Historical Cell Site Data*, rejected Ford's position outright. *See* 724 F.3d at 612-13. **[\*190]** We agree with the Fifth

Circuit's **[\*\*37]** conclusion.

The Fifth Circuit emphasized that a cell phone user generally understands: (1) their cell phone must send a signal to a nearby cell tower in order to wirelessly connect their call; (2) if their cell phone cannot pick up a signal, they are out of range of their service provider's tower network; and (3) if too many customers in the same area attempt to make calls at the same time, the call may not go through because the network's local towers are overloaded with traffic. *Id*. at 613; *Barfield*, 416 S.W.3d at 748. Accordingly, a cell phone user knows that in order to receive service the provider will have to know which tower their phone is connecting to. *In re U.S. for Historical Cell Site Data*, 724 F.3d at 613; *Barfield*, 416 S.W.3d at 748.

This information — AT&T's records of which towers Ford's phone connected with to receive cellular service — was what the State used to determine his phone's approximate location at certain times on the night Edwards was murdered. Ultimately, Ford voluntarily decided to obtain a cell phone, chose AT&T as a service provider, and availed himself of the benefits of its network of cell towers. *See Barfield*, 416 S.W.3d at 748-49. Accordingly, we overrule this issue and hold Ford voluntarily disclosed the location of his cell phone through cell site data to a third party. *See id*.; *In re U.S. for Historical Cell Site Data*, 724 F.3d at 614.

Admittedly, unlike **[\*\*38]** the situation in the Fifth Circuit case, where the user data included affirmative activity like placing calls, Ford's incriminating evidence was determined from records of passive activity on his cell phone.[2] However, this is a distinction without a functional difference. Ford still voluntarily availed himself of AT&T's cellular service, which includes the ability to receive data sent to a subscriber's phone, when he chose it as his provider.

---

**FOOTNOTES**

[2] The records used by the State to pinpoint Ford's location on the night of Edwards's murder were determined from records of passive activity on his phone, i.e. he was not placing a call when his phone connected with the cell tower. Rather, the records relevant to the State's case, the 11:45 p.m. and 1:19 a.m. "pings" off of the Gallery Court tower, were from a missed call and text message, respectively, from Tarver. None of Ford's active cell phone usage on the night in question, e.g., his response text to Tarver at 11:33 p.m. or his checked voicemail at 2:30 a.m., is located in the vicinity of the Gallery Court tower near Edwards's residence.

---

And finally, with regard to Ford's Fourth Amendment claims, we note he directed the court, after oral argument, to the United **[\*\*39]** States Supreme Court's recent decision in *Riley v. California*,    U.S.     , 134 S. Ct. 2473, 189 L. Ed. 2d 430, 2014 WL 2864483 (2014). In *Riley*, the Court held that the police must obtain a warrant before searching the contents of a cell phone seized incident to an arrest. 134 S. Ct. 2473, 189 L. Ed. 2d 430, *Id*. WL at *20; *cf. State v. Granville*, 423 S.W.3d 399, 417 (Tex. Crim. App. 2014) (holding "a citizen does not lose his reasonable expectation of privacy in the contents of his cell phone merely because that cell phone is being stored in a jail property room."). Although *Riley* concerned cell phones and the Fourth Amendment, it is otherwise dissimilar to the present case. Unlike the present situation where a third party collected the information later obtained by the police without a warrant, in *Riley* the police directly examined the private contents of the suspect's cell phone. 134 S. Ct. 2473, 189 L. Ed. 2d 430, *Id*. WL at *5. *Riley* does not concern the third party doctrine espoused in *Smith*, 442 U.S. at 743-44, and relied upon in reaching our decision. Therefore, *Riley* is **[\*191]** otherwise inapplicable to the present situation involving a court order to obtain AT&T's business records of Ford's use of its cell tower network. Accordingly, we reject Ford's argument that *Riley* is applicable in this case.

**Article I, section 9 of the Texas Constitution**:

In addition to his Fourth Amendment challenge, Ford contends the State's warrantless acquisitions of his historical cell site records from AT&T violated his rights under the Texas Constitution. **[\*\*40]**

Specifically, Ford contends his rights under Article I, section nine — which mirror those of the Fourth Amendment — were violated. *HN16*⬆Like the Fourth Amendment, the Texas Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches. . ." TEX. CONST. art. I, § 9. However, Ford did not preserve this issue for our review.

Ford's written motion to suppress and oral argument before the trial court made no mention of his rights under the Texas Constitution. It is also not apparent from the context of the record that the error is preserved by way of the parties having a shared understanding of a Texas constitutional complaint being made. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Lankston v. State*, 827 S.W.2d 907, 911 (Tex. Crim. App. 1992). Accordingly, we overrule Ford's argument and hold he did not preserve this argument based on the Texas constitution for our review. *See Pena*, 285 S.W.3d at 464 (holding appellant failed to preserve for review claim that right to due course of law under Texas Constitution provided greater protection than due process clause of U.S. Constitution when he did not argue at trial that Texas Constitution provided greater protection.); TEX. R. APP. P. 33.1.

**First Amendment**:

Ford next contends his First Amendment right to freely associate was violated by the State's warrantless acquisition of historical cell site records of his phone from AT&T. **[**41]** *See* U.S. CONST. amend. I. Specifically, Ford argues that "[b]y accessing and scrutinizing location data without a warrant supported by probable cause, the State is engaged in actions that chill the freedom of association."

Although the State contends Ford did not preserve this issue for our review, the record reveals Ford's counsel made the following passing reference to a First Amendment-based argument during the hearing on the motion to suppress:

> Gathering information that the Supreme Court has just said is the type of information that is subject to a reasonable expectation of privacy, even to a First Amendment objection on — in that sometimes this sort of information reveals association, the Freedom of Association Clause of the Constitution of the Bills of Rights.

Ford has supplemented this brief argument at trial with citations to Justice Sotomayor's concurrence in *Jones*, 132 S.Ct. at 956 (Sotomayor, J., concurring), and *Stanford v. Texas* for the proposition that search warrants must be supported by probable cause that describes the things to be seized with scrupulous exactitude. *See* 379 U.S. 476, 485, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965). Admittedly, Justice Sotomayor's concurrence does express concern that "[a]wareness that the Government may be watching chills associational and expressive freedoms . . . [a]nd the Government's unrestrained power to assemble data that reveal private aspects of identity **[**42]** is susceptible to abuse." *Jones*, 132 S.Ct. at 956 (Sotomayor, J., concurring). However, Ford has not argued how that concern affects our decision here.

 **[*192]** Ford has not presented an actual First Amendment issue for the court to consider because he has not argued how the State's use of *his* historical cell site records actually and specifically interfered with *his* freedom of association. Rather, without relevant citation to the record, Ford has merely argued in conclusory fashion that "the State is engaged in actions that chill the freedom of association." Accordingly, we hold Ford inadequately briefed this issue for our review by failing to present an actual argument of how his First Amendment associational rights were infringed by the State. *See* TEX. R. APP. P. 38.1(h); *see also Lockett v. State*, 16 S.W.3d 504, 505 n.2 (Tex. App.—Houston [1st Dist.] 2000, pet ref'd) (holding that *HN17*⬆conclusory statement supported by neither argument nor authority presents nothing for our review). Further, even if Ford would have presented a legitimate "association" argument, we hold it fails on the merits.

The general premise underlying our holding on the Fourth Amendment issue is that the historical cell site data obtained by the State was a legitimate business record of information Ford initially conveyed

to a third party, the subsequent conveyance of which he cannot successfully challenge **[\*\*43]** under the Fourth Amendment. *See Jerry T. O'Brien, Inc.*, 467 U.S. at 743. If this court were to hold that the State could not obtain Ford's historical cell site records from AT&T without a warrant due to First Amendment concerns, the holding would have to apply to all business records. This is because any business record, whether it be a grocery receipt, Amazon invoice, or charitable giving receipt, reveals an individual's associations and could be subject to abuse by the State. We decline to render a decision with such broad implications. Therefore, we overrule Ford's issue and hold his associational freedoms under the First Amendment were not infringed.

## Search Warrants — Ford's Home, Car, and DNA

In his next points of error, Ford contends he was entitled to a Franks hearing on his motion to suppress the searches resulting from warrants to obtain his DNA, search his home, and search his vehicle. Ford claims Detective Leroy Carrion's affidavits, which were used to obtain the search warrants, contained false statements that were necessary to the threshold finding of probable cause.

The United States Supreme Court held in *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978):

> [W]here the *HN18* defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was **[\*\*44]** included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id*. at 155-56; *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). The Court of Criminal Appeals has refined the requirements to obtaining a *Franks* hearing into three prongs. *See Cates*, 120 S.W.3d at 357-59. The first prong of *Franks* requires a defendant to allege a deliberate falsehood, or the affiant's reckless disregard for the truth, and specifically point out that portion of the affidavit alleged to be false. *Id*. at 357. The second prong of *Franks* requires a defendant to accompany her allegations of falsity with either an offer of proof, affidavit, or otherwise reliable witness statement, unless the absence of such support is satisfactorily explained. *Id*. at 358. **[\*193]** The third and final prong of *Franks* requires a defendant to prove that if the deliberately false sections of the affidavit are removed, the remainder of the "four corners" of the affidavit no longer presents probable cause to search a particular location. *Id*. at 358-59. Here, the State conceded the first two *Cates* prongs at trial. The trial court then redacted the affidavits and concluded probable cause existed even in the absence of the redacted **[\*\*45]** information. Therefore, we are left to consider whether Ford established the remaining portions of Detective Carrion's affidavits were insufficient to support probable cause to search Ford's home, car, and obtain his DNA.

Ford alleged before the trial court that Detective Carrion falsely stated Tarver and Federspill's testimony, and mischaracterized the photos taken of the Gallery Court entrance from the ATM camera. Specifically, Ford challenged Detective Carrion's characterization of the testimony regarding whether Ford's car was not seen in the church parking lot, Ford's responses to text messages, as well as the detective's recitation of the contents of the ATM photographs.

*HN19* Probable cause for a search warrant exists when, viewed under the totality of the circumstances, there is a fair probability that evidence of a crime will be found at the specified location. *State v. McLain*, 337 S.W.3d 268, 272 (Tex. Crim. App. 2011). This is a *flexible* and *non-demanding* standard. *Id*. (emphasis added). Here, where the magistrate did find probable cause based on the redacted affidavits, we apply a highly deferential standard of review due to the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search. **[\*\*46]** *Id*. at 271. We will uphold the magistrate's probable cause determination as long as the magistrate had a substantial basis for concluding probable cause existed. *Id*.

Here, even without the portions of Detective Carrion's affidavit challenged by Ford, we hold Detective Carrion's affidavit was sufficient to establish probable cause to support the search warrants.

Specifically, the redacted affidavits assert: Ford is a recent ex-boyfriend of Edwards; he attended the same New Year's Eve party as Edwards; he drove to the party in his white Chevy Tahoe; despite allegedly heading home after the party, Ford's friends did not see his Tahoe parked in his driveway after the party; surveillance photos depict a vehicle similar to Ford's entering and exiting Edwards's condominium complex around 11:40 p.m.; surveillance photos depict a figure consistent in appearance with Ford walking into the complex at 11:42 p.m.; and male DNA was found on the towel covering Edwards's head. Given the nexus between Ford and Edwards's murder from the information remaining in Detective Carrion's affidavits, under the totality of the circumstances, we hold there is a fair probability evidence relating to the murder would have **[**47]** been found in Ford's vehicle, home, and DNA. *See McLain*, 337 S.W.3d at 272. Accordingly, we hold Ford did not satisfy the third prong required for a *Franks* hearing and overrule his point of error. *See Cates*, 120 S.W.3d at 358-59.

**Improperly Admitted Evidence of Alleged Murder Weapons**

Ford next contends the trial court erred when it allowed the State to introduce into evidence two pieces of demonstrative evidence representing the alleged murder weapons. Specifically, Ford contends the trial court erred by allowing the admission of a metal three-hole punch and a charging cord for a wireless electric drill. The State sought to introduce these items because **[*194]** Deborah Edwards, the mother of the victim, testified at trial she discovered these items were missing from her daughter's condominium when she was packing it up three years after the murder.

*HN20* We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); *Montgomery v. State*, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990); *Young v. State*, 382 S.W.3d 414, 420 (Tex. App.—Texarkana 2012, pet. ref'd). We may hold a trial court abused its discretion only if its decision falls outside the zone of reasonable disagreement. *Green*, 934 S.W.2d at 102.

**Three-Hole Punch**

At trial, Deborah Edwards testified she discovered her daughter's antique, metal three-hole punch was missing from the condominium. She also testified she was able to **[**48]** locate and purchase a three-hold punch that was a close match to the missing hole-punch. She testified the item she purchased was "very similar" to the one owned by her daughter. The State then moved to offer the hole-punch into evidence and counsel for Ford stated "No objection."

*HN21* An appellant affirmatively waives their right to have the trial judge determine the admissibility of evidence when they state "no objection" to the offered evidence. *Holmes v. State*, 248 S.W.3d 194, 200 (Tex. Crim. App. 2008). A party is not excused from the procedural requirement to object at trial to the admission of evidence even if the error involves a constitutional right. *Jimenez v. State*, 32 S.W.3d 233, 235 (Tex. Crim. App. 2000). Accordingly, an appellant who did not object to the admission of evidence at trial waives any claim on appeal that the trial erred in admitting that evidence. *See Holmes*, 248 S.W.3d 200; *see also* Tex. R. App. P. 33.1. Because Ford did not object to the admission of the three-hole punch at trial, we hold Ford waived this argument on appeal and overrule this point of error. *See Holmes*, 248 S.W.3d 200.

Ford directs this court to *Jimenez* and contends in his brief that we should not find the alleged error waived, but rather review it as plain or fundamental error that deprived him of a fair or impartial trial. We disagree. *Jimenez* dealt with jury charge error **[**49]** as "fundamental error" under Texas Code of Criminal Procedure article 36.19. *See Jimenez*, 32 S.W.3d at 236-37 (citing Tex. Code Crim. Proc. Ann. art. 36.19). Alleged jury charge error is not at issue here, and Ford has not directed this court to any authority applying fundamental error principles to the unobjected to introduction of evidence at trial. Accordingly, we overrule Ford's argument.

**Charging Cord**

At trial, Deborah Edwards testified that a power cord used to charge a cordless electric drill was also

missing from her daughter's condominium. Specifically, Deborah Edwards testified:

> She had one and she bought her father one just like it. And when we were putting things up, the cord was missing from hers. It was in her office. . . . She bought them at the same time.

The State then moved to introduce into evidence the identical charging cord from the drill Edwards had purchased for her father. Ford objected that the cord was not relevant and invited speculation. The State responded that the proffered "exhibit is an exact copy of the charging cord that is missing from the deceased's cordless charger that was in the office where she was found murdered by strangulation." The trial court overruled Ford's objection and admitted the cord into evidence. Ford **[*195]** contends the trial court erred, but we **[**50]** disagree.

As stated above, we review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Green*, 934 S.W.2d at 101-02. We may hold a trial court abused its discretion only if its decision falls outside the zone of reasonable disagreement. *Green*, 934 S.W.2d at 102. *HN22*⬆Under the Texas Rules of Evidence, all relevant evidence is admissible, except as provided otherwise by constitution, statute, or other rules of evidence. TEX. R. EVID. 402.

Here, the power cord introduced by the State was properly admitted over objection as demonstrative evidence of an item missing from the victim's home. The victim died from strangulation by ligature and it is relevant that a possible ligature, the power cord, was missing from the victim's home. Whether or not the power cord is the type of ligature used to murder the victim is a question of fact to be determined by the jury and is not the present issue. The present issue is whether or not the power cord introduced by the State is acceptable demonstrative evidence of the power cord missing from the victim's home. Here, Deborah Edwards testified the victim had purchased identical drills with identical charging cords for her father and herself. Accordingly, we hold the trial court did not abuse **[**51]** its discretion by allowing the State's exhibit as demonstrative evidence of the missing power cord. *See Green*, 934 S.W.2d at 101-02.

Ford's counter argument seems to focus on the State's purpose for introducing the power cord — to present it as the murder weapon used to strangle Edwards. Ford argues, in essence, the admission of the cord as the speculative murder weapon is not based on the evidence and deprived him "of a fair trial by allowing the State to present to the jury a full story and avoid the fact that it lacked any weapons and any real evidence against Ford." This argument is without merit. The State elicited testimony that the cord was missing from the crime scene, presented an identical cord into evidence, and argued that the missing cord could have in fact been the murder weapon. Such "speculation" is a proper use of circumstantial evidence and a question of fact for the jury to resolve.

**Improper Jury Argument**

Ford next contends his "conviction should be reversed and he should be granted a new trial" because of several alleged instances of improper jury argument by the State. Specifically, Ford argues: (1) the State improperly called Ford a liar twelve times during opening statements; (2) the State **[**52]** improperly shifted the burden of proof during its closing argument; and (3) the State improperly commented on Ford's failure to testify during its closing argument.

**Opening Statements**

Ford contends the State engaged in improper jury argument when it allegedly called him a "liar" twelve times during opening statements. Having reviewed the portion of opening statements referenced by Ford in his brief, it appears Ford objected to the following instances of being called a "liar" at trial:

> 1.) "What you will see is a man who has his lies down."

> 2.) "What you will see is that he's able to account for everything and he has the lies down. And you will know that they are lies by the technology . . ."

3.) "I expect that you will see that he is lying. And I expect that the evidence will show that he is lying and that he has an answer for everything. And you will hear that on his **[*196]** DVD. It is his statement. What you will recognize is that he gives an alibi and that that alibi is a blatant lie and that will be revealed by the assertions in this case."

4.) "He didn't count on those things. And he didn't count on the technology to reveal his lies."

5.) "The evidence will show that time and time again — and **[**53]** the evidence will highlight that this self-constructed alibi is a lie."

The trial court sustained Ford's objections as to the first four instances set out above, but did not rule on his fifth objection. Instead, the trial court stated after the fifth objection, "[l]et's move on, please." Despite an instruction to "move on," the State continued and stated:

You will see that he lied repeatedly to police, to friends, to everyone. And you will see that this alibi is a lie.

Ford's counsel objected again, prompting the trial court to ask the State to discuss "what you expect the evidence to show, please." To which the State responded: "Sure. . . [t]he evidence will show he's a liar." The trial court then asked counsel to approach the bench. After a brief discussion of the issue, the trial court gave the following instruction to the jury:

All right. Ladies and Gentlemen of the Jury, we have an — ongoing opening statements going on, so the opening statement is to tell you what the evidence is expected to show. In the course of opening, if there's argument, and right now I think the reference to, in particular, the issue being that the Defendant is a liar, that part I'm — I'm holding is argument and I'm **[**54]** asking you to disregard that portion of the opening statement.

Ford then moved for a mistrial, and the trial court denied his request.

*HN23* During a criminal proceeding, the State has the statutory right to state to the jury the nature of the accusations against the defendant and the facts which are expected to be proved by the State in support thereof. Tex. Code Crim. Proc. Ann. art. 36.01(a)(3); *Taylor v. State*, 947 S.W.2d 698, 706 (Tex. App.—Fort Worth 1997, pet. ref'd). Because the trial court sustained Ford's ongoing objection to the State's accusations in its opening statement, and instructed the jury to disregard said statements, "[t]he only adverse ruling — and thus the only occasion for making a mistake — was the trial court's denial of the motion for mistrial." *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011) (quoting *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). Therefore, the proper issue is whether the trial court abused its discretion by denying Ford's request for a mistrial. *See Archie*, 340 S.W.3d at 738-39; *Hawkins*, 135 S.W.3d at 77.

*HN24* Only in extreme circumstances of incurable prejudice will mistrial be required. *Hawkins*, 135 S.W.3d at 77. In evaluating whether the trial court abused its discretion by denying a mistrial for improper argument, we apply and balance the following three factors: (1) the severity of the misconduct (magnitude of the prejudicial effect of remarks); (2) the measures adopted to cure the misconduct (efficacy of any cautionary instruction by **[**55]** the trial court); and (3) the certainty of conviction absent the misconduct (strength of evidence supporting conviction). *Archie*, 340 S.W.3d at 739 (adopting factors from *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)).

Here, after applying the foregoing factors to the statements made by the State, we hold the trial court did not abuse its discretion by denying Ford's request for a mistrial. First, although the State **[*197]** used the blunt and arguably prejudicial approach of referring to Ford's "lies," it does not appear it engaged in an overtly improper opening statement. Under article 36.01, the State has a statutory right to present to the jury its accusations against the defendant and the facts that support it, which is what it appears the State is doing here — casting aspersions on Ford's alibi. *See* Tex. Code Crim. Proc. Ann.

art. 36.01(a)(3). The State's principal theory of the case and accusation against Ford is that his alibi of being at home at the time of Edwards' murder is a lie, and that he was in fact at Edwards's home murdering her. The challenged statements, in essence, make abundantly clear to the jury that the State believes the evidence will illustrate Ford's alibi is a lie. Accordingly, we hold the State's actions do not constitute outright misconduct that goes outside the scope of opening statements **[\*\*56]** and prejudices Ford. *See id*. Admittedly, the use of the term "lies" is charged language that could be viewed as prejudicial in nature; however, as discussed below, the trial court's instruction to the jury resolved any damage that might have been caused by the statements.

At Ford's request, the trial court instructed the jury to disregard the portion of the State's opening statement setting Ford out as a "liar." It is presumed the jury duly obeyed this instruction to disregard the contested portions of the State's opening argument. *Archie*, 340 S.W.3d at 741. This court has held that "[u]sually, an *HN25*instruction to disregard the argument will cure any error caused by improper argument." *Berkley v. State*, 298 S.W. 3d 712, 714 (Tex. App.—San Antonio 2009, pet. ref'd). Here, we see no reason to hold the instruction did not cure any harm caused by the State's opening, and Ford has not presented any argument to rebut the curative strength of the jury instruction. Accordingly, we overrule Ford's argument and hold the trial court did not abuse its discretion when it denied Ford's request for a mistrial. *See Archie*, 340 S.W.3d at 738-39.

Ford, however, has directed this court to our decision in *Gilcrease v. State* for the proposition that name calling can be grounds for reversal if employed as a repeated tactic. *See* 32 S.W.3d 277, 279 (Tex. App.—San Antonio 2000, pet. ref'd). In *Gilcrease*, the **[\*\*57]** State argued during closing argument the victim "was selected by this bastard over here to be his victim." *Id*. at 278. The trial court overruled an objection to calling the defendant a "bastard," and we held the trial court should have sustained the objection and admonished the State's attorney. *Id*. at 279. *Gilcrease* is distinguishable from the present case. The use of the term "bastard" served no legitimate purpose and is substantially more inflammatory than the references to the "lies" the State legitimately expected to prove to the jury here. Simply stated, referring to the defendant's "lies," even though a repeated tactic, is not name calling on par with the term "bastard." Additionally, unlike in *Gilcrease*, Ford's objections to the State's comments were sustained and he obtained a jury instruction to disregard the potentially harmful references to Ford's "lies." Accordingly, *Gilcrease* is distinguishable.

**Burden Shifting**

Ford next contends the State improperly shifted the burden of proof during its closing argument. After discussing Ford's alibi and the evidence presented at trial, the State made the following closing argument:

> If not him, who? I mean, they're going to tell you that's shifting the burden **[\*\*58]** of proof. . . Who? They've put on a case. They've called witnesses. They — they have certainly cross-examined. Who?

**[\*198]** Ford's objection to this argument was overruled by the trial court.

*HN26*Proper jury argument falls generally within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument made by opposing counsel; and (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Error exists when an argument presents facts not supported by the record to the jury, but this error is not reversible unless, in light of the entire record, the argument is extreme or manifestly improper. *See id*.

Here, the trial court properly overruled Ford's objection because the State's argument was a reasonable deduction from the evidence. *See id*. Having presented its theory of the case and web of circumstantial evidence linking Ford to the murder, it was a reasonable deduction from the evidence for the State to argue no one else could have or would have committed this crime except Ford. Accordingly, we hold the State engaged in proper jury argument.

Ford counters by citing to *Dee v. State*, 388 S.W.2d 946 (Tex. Crim. App. 1965), for the proposition

that prosecutorial jury argument that shifts the burden of proof is reversible error. **[\*\*59]** Not only does Ford's passing citation fail to describe *how* the State actually shifted the burden of proof, but also Ford's reliance on *Dee* is misplaced. The eventual reversal in Dee was not based on an improper argument shifting the burden of proof, but rather the prosecution's argument erroneously placing the defendant's character in issue. *See id*. at 947; *see also Waldo v. State*, 746 S.W.2d 750, 756 (Tex. Crim. App. 1988) (noting *Dee* concerned prosecution erroneously placing the defendant's character at issue). Accordingly, *Dee* is not on point and does not offer any direct support for Ford's position.

## Ford's Failure to Testify

Ford next contends the following jury argument by the State was an improper comment on his failure to testify at trial:

> And they keep talking about this rumor mill, this rumor mill. Well, you know what? A rumor mill doesn't paralyze you. If there's — if a rumor starts to generate, well, do something to dispel it. How about say for once to somebody, I didn't do this! And he has not said that one time to anyone.

Ford failed to object to this allegedly improper comment on his failure to testify.

*HN27* The State's comment on an accused's failure to testify violates the defendant's state and federal constitutional privileges against self-incrimination. **[\*\*60]** *Archie*, 340 S.W.3d at 738. However, a defendant's failure to object to a jury argument or failure to pursue an adverse ruling to an objection to a jury argument forfeits the defendant's right to complain about the argument on appeal. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *see Mathis v. State*, 67 S.W.3d 918, 927 (Tex. Crim. App. 2002) (affirming *Cockrell* as being in line with Texas Rule of Appellate Procedure 33.1).

As stated above, Ford did not object to the State's argument complained of on appeal. Accordingly, we hold this argument was not preserved for our review. *See Cockrell*, 933 S.W.2d at 89.

Ford, however, directs this court to *Rodriguez v. State*, 646 S.W.2d 539, 542-43 (Tex. App.—Houston [1st Dist.] 1982, no writ.), to support the proposition directly quoted in his brief that "neither a timely objection nor an adverse ruling is required to preserve error if the argument is so prejudicial that an instruction to disregard cannot cure the harm." There are two **[\*199]** problems with Ford's counter argument. First, *Rodriguez* does not contain this language nor does it support the proposition for which it is cited. *See id*. Second, even if *Rodriquez* supported Ford's argument, it conflicts with *Cockrell*, which expressly held that any prior cases to the contrary, such as *Romo v. State*, 631 S.W.2d 504 (Tex. Crim. App. 1982), are overruled. *Cockrell*, 933 S.W.2d at 89 (overruling *Romo*, 631 S.W.2d 504, which held a defendant may complain for the first time on appeal about an unobjected-to, erroneous jury argument that could not have been cured by an instruction **[\*\*61]** to disregard.).

Additionally, Ford directs this court to the decision of *York v. State*, 126 Tex. Crim. 659, 73 S.W.2d 538 (Tex. Crim. App. 1934), for the proposition that the Court of Criminal Appeals has a long history of reversing criminal judgments where the prosecution has engaged in referencing the failure of the accused to testify. *See id*. ("For the error in the argument mentioned we have no option but to reverse the judgment and remand the cause for new trial."). That may be the case; however, the Court of Criminal Appeals also requires a defendant to properly preserve the issue of improper jury argument for appeal. *See Cockrell*, 933 S.W.2d at 89. Accordingly, we overrule Ford's point of error.

## Equitable Continuance

Ford next contends the trial court erred when it denied his oral request for a continuance. Ford sought the continuance in order to review exhibits presented by State expert Kenneth Doll. At trial, Doll used color charts representing cellular coverage that had, admittedly, not been provided to Ford before trial. The State contended the charts contained only information that was included in the cell phone records that had in fact been provided to Ford before trial. Ford asked the trial court for "at least a couple of hours" to review the charts, and the trial court **[\*\*62]** denied his request.

*HN28* The Texas Code of Criminal Procedure allows a continuance in a criminal action only upon the *written* motion of the State or of the defendant setting forth sufficient cause. Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. Aɴɴ. art. 29.03 (emphasis added). Ford argues there is a due process exception to the rule requiring a continuance to be in writing. *See O'Rarden v. State*, 777 S.W.2d 455, 459 (Tex. App.—Dallas 1989, pet. ref'd). The Court of Criminal Appeals has "explicitly refused to recognize a due process exception to the rule requiring motions for continuances to be written and sworn in order to be preserved on appeal." *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (citing to *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009)). Likewise, this court has expressly rejected this notion. *Jimenez v. State*, 307 S.W.3d 325, 331 (Tex. App.—San Antonio 2009, pet. ref'd). Accordingly, we overrule Ford's point of error and hold his failure to file a written continuance failed to preserve error for our review. *See Blackshear*, 385 S.W.3d at 590.

**Independent Examination of DNA Evidence**

After his conviction, but prior to the filing of the motion for new trial, Ford filed a motion for independent testing of DNA evidence in the State's possession, including but not limited to, four brown human hairs found on Edwards's left hand at the scene of her murder. The trial court denied Ford's motion at the hearing on the motion for new trial. Ford contends the trial court abused its discretion by doing so.[3]

---

**FOOTNOTES**

[3] The State argues **[**63]** there is no error preserved for our review because the "motion was not presented to the court during the hearing, and Appellant never asked the court to rule on it." This is simply not the case. During the hearing on Ford's motion for new trial, his counsel reminded the trial court that:

> We do have my motion for DNA testing, the mitochondrial blood testing of the right hand of Ms. Edwards. I want to obtain the Court's ruling on that motion so I may preserve the issue that I'm raising for this motion for new trial.

The trial court then denied Ford's motion on the record.

---

 **[*200]** Under the version of Texas Code of Criminal Procedure article 39.14(a) applicable at the time of trial:

> *HN29* Upon motion of the defendant showing good cause therefor and upon notice to the other parties . . . the court in which an action is pending shall order the State *before* or *during trial* of a criminal action therein pending or on trial to produce and permit the inspection . . . [of] evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies.

Act of April 16, 2009, 81st Leg., R.S., ch. 276, 2009 Tex. Gen. Laws 733 (amended 2014) (current version at Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. Aɴɴ. art. 39.14(a) (West 2014)) (emphasis added). The State **[**64]** contends Ford's motion was not timely filed, and therefore the trial court did not err by denying the motion. We agree.

Article 39.14(a) allowed discovery and inspection of the material evidence sought by Ford when requested "*before or during trial*." *See id*. (emphasis added). Here, Ford's motion was filed after he was found guilty of murdering Edwards, not before or during trial, and was therefore not timely under article 39.14(a). *See id*. Accordingly, we overrule Ford's argument and hold the trial court did not err by denying his motion to inspect DNA evidence.

**Alternate Perpetrator Evidence**

Ford next contends the trial court erred by denying his attempt to introduce evidence that the Edwards family's Gillespie County home was burglarized without signs of forced entry on December 30, 2008, the day before Edwards's murder. Ford argues this evidence was admissible as alternate perpetrator evidence and, alternatively, admissible as contextual evidence.

As noted above, we review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Green*, 934 S.W.2d at 101-02. We may hold a trial court abused its discretion only if its ruling falls outside the zone of reasonable disagreement. *Id*. at 102.

Ford's first argument is that the evidence **[**65]** of the burglary is admissible alternate perpetrator evidence. *HN30*⬆When a defendant seeks to introduce evidence of an "alternate perpetrator," he must establish a sufficient nexus between that person and the crime. *Lopez v. State*, 314 S.W.3d 54, 61 (Tex. App.—San Antonio 2010, pet. ref'd) (citing *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002)). This court has recognized it is not sufficient for a defendant to merely proffer "unsupported speculation" that another person may have committed the crime. *Id*. at 61. Specifically, when the evidence does not point to a *particular individual* as being responsible for the crime, the proffered evidence amounts to no more than mere speculation that another person may have committed the crime. *See id*. at 61-62 (emphasis added).

Here, Ford has not directed the court to any particular alternate individual suspected of committing the crime. Rather, Ford has directed the court to the burglary to **[*201]** suggest an unidentified common culprit. The evidence proffered by Ford does not present a sufficient nexus for admissible alternate perpetrator evidence. *See id*. at 61. Instead of suggesting an identified particular individual as being responsible for the crime, Ford merely provided speculation that there is a common culprit for both incidents. Accordingly, we overrule this portion of the issue and hold the trial **[**66]** court did not abuse its discretion. *See Green*, 934 S.W.2d at 101-02

Ford also argues evidence of the Gillespie County burglary is admissible "context evidence" with regard to Edwards's murder. He makes this argument for the first time on appeal. Accordingly, he has not preserved this argument for our review. *See Reynolds*, 423 S.W.3d at 383; Tᴇx. R. Aᴘᴘ. P. 33.1. However, even if Ford's "context evidence" argument were preserved, it still fails.

In support of his "context evidence" argument, Ford directs the court to *Mann v. State*, 718 S.W.2d 741 (Tex. Crim. App. 1986), for the proposition the evidence proffered here is almost always admissible. Specifically, Ford argues offenses rarely occur in a vacuum, and the burglary at the Gillespie County property immediately preceding the events at Edwards's condominium provides admissible context evidence for the murder. We disagree. *Mann* does not support the "context evidence" Ford sought to introduce at trial. Rather, *Mann* concerned introduction of extraneous offense evidence used against the defendant and held:

> [E]vidence of the context of the offense is almost always admissible under the reasoning that events do not occur in a vacuum and the jury has a right to have the offense place in its proper setting so that all of the evidence may be realistically evaluated.

*Id*. at 744. Here, Ford **[**67]** was not attempting introduce extraneous offense "context" evidence against himself. Accordingly, we overrule Ford's argument.

**Cᴏɴᴄʟᴜsɪᴏɴ**

Based on the foregoing, we overrule Ford's points of error and affirm the trial court's judgment.

Marialyn Barnard, Justice

Publish

**DISSENT BY:** Luz Elena D. Chapa

## DISSENT

"[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); *see Katz v. United States*, 389 U.S. 347, 360-62, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Ford's cell phone provider tracked, collected, and recorded information about Ford's physical movements and location whenever he received or placed a call or text message. This "historical cell site data" was based on the cell phone towers through which his calls and texts were routed. Because I would hold that Ford retained an objectively reasonable expectation of privacy in his physical movements and location, I respectfully dissent from the court's judgment affirming Ford's conviction.

The amount of detailed information that a cell phone provider has the means to track, collect, and record about its customers as they conduct their everyday lives is staggering. *See United States v. Jones*, 132 S.Ct. 945, 963, 181 L. Ed. 2d 911 (2012) (Alito, J., concurring in judgment). For instance, "[h]istoric location information is a standard **[**68]** feature on many smart phones and can reconstruct someone's specific movements down to the **[*202]** minute, not only around town but also within a particular building." *Riley v. California*, 134 S.Ct. 2473, 2490, 189 L. Ed. 2d 430 (2014). Although less precise than GPS records, the historic cell site data compiled by cell phone providers can generate a "comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *See Jones*, 132 S.Ct. at 955 (Sotomayor, J., concurring); *see also id*. at 963 (Alito, J., concurring in judgment).

The majority holds that the third-party doctrine precludes Ford from having a reasonable expectation of privacy in this "historical cell site data" because he "voluntarily disclosed" it to his cell phone provider in the course of using his cell phone. To achieve this result, the majority relies on *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) and *United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976).[1] These cases predate the advent of the earliest commercially available handheld cell phones.[2]

---

### FOOTNOTES

[1] Although the majority primarily cites to opinions from the Fifth Circuit and the Fourteenth Court of Appeals, the underpinnings of its reasoning flow directly from the also-cited *Smith* and *Miller*.

[2] The first commercial cell phone system was introduced in 1983. *Mobile Telephone*, **[**69]** ENCYCLOPEDIA BRITANNICA ONLINE, http://www.britannica.com/EBchecked/topic/1482373/mobile-telephone/279851/Development-of-cellular-systems (last updated Sept. 5, 2013).

---

But the Supreme Court has recently recognized that modern cell phones—now a "pervasive and insistent" part of modern life—present privacy concerns far beyond the founding principles of the Fourth Amendment and the circumstances of the founding era. *See Riley*, 134 S.Ct. at 2484. In *Riley*, the Court held that the search-incident-to-an-arrest doctrine did not allow arresting officers to search the digital contents of cell phones seized in connection with an arrest. *Id*. at 2493-94. The Court recognized that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse" and that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Id*. at 2488-89. Thus, the Court eschewed a "mechanical application" of its prior precedent that might well have supported a warrantless search of the appellant's cell phone. *Id*. at 2484. Similar to the way that the search-incident-to-arrest doctrine was ill suited to the digital data contained on cell phones seized during an arrest, the third-party doctrine is "ill suited to the digital age, in which people reveal a

great deal **[\*\*70]** of information about themselves to third parties in the course of carrying out mundane tasks." *Jones*, 132 S.Ct. at 957 (Sotomayor, J., concurring).

The majority's application of the third-party doctrine sweeps intimate details of a person's life outside the scope of the Fourth Amendment's protections because cell phone customers "voluntarily disclose" their location information simply by owning and using their cell phones. The majority thus confronts cell phone customers with a choice between Scylla and Charybdis: either forego the use of technology that has become a pervasive and insistent part of modern, everyday life or forego the protections of the Fourth Amendment. I cannot join such a sweeping and mechanical application of *Smith* and *Miller*.

Instead, I agree with the Third and Eleventh Circuits and conclude that "a cell phone customer has not 'voluntarily' **[\*203]** shared his location information with a cellular provider in any meaningful way." *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'ns Serv. to Disclose Records to Gov't*, 620 F.3d 304, 317 (3rd Cir. 2010); *United States v. Davis*, 754 F.3d 1205, 1216-17 (11th Cir. 2014). I would therefore hold that Ford did not voluntarily surrender his reasonable expectation of privacy in his physical location and movements simply by using his cell phone. Because the State did not secure a warrant before obtaining the historical cell site data from **[\*\*71]** Ford's cell phone provider, Ford's Fourth Amendment rights were violated, and the trial court should have granted his motion to suppress.

Because the Fourth Amendment required suppression of the historical cell site data, the denial of Ford's motion to suppress was constitutional error. When an appellate court determines there was constitutional error at trial, it must "reverse a judgment of conviction . . . unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction . . . . TEX. R. APP. P. 44.2(a). The evidence against Ford was largely circumstantial, and I am unable to conclude beyond a reasonable doubt the erroneous admission of the historical cell site data did not contribute to Ford's conviction. I would therefore reverse Ford's conviction and remand this case to the trial court for further proceedings. Because the majority does not do so, I dissent.

Luz Elena D. Chapa, Justice

Publish

Service: **Get by LEXSEE®**
Citation: **444 s.W.3d 171**
View: Full
Date/Time: Monday, March 23, 2015 - 11:34 PM EDT

\* Signal Legend:
🟥 - Warning: Negative treatment is indicated
🅀 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🅐 - Citing Refs. With Analysis Available
🅘 - Citation information available
\* Click on any *Shepard's* signal to *Shepardize*® that case.

 About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright ©  2015 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.